FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

JUN 2 3 2011

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk



## THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

UNITED STATES OF AMERICA *ex rel.,*    *

VICTOR E. BIBBY and BRIAN J.    *

DONNELLY,    *

   *

     RELATORS/PLAINTIFFS,    *

   *

vs.    *

   *

WELLS FARGO BANK, NATIONAL    *

ASSOCIATION (INC.), individually and    *

as s/b/m with WELLS FARGO    *

HOME MORTGAGE, INC.;    *

COUNTRYWIDE HOME LOANS, INC.,    *

COUNTRYWIDE HOME LOANS    *

SERVICING, LP n/k/a BAC HOME    *

LOANS SERVICING, LP;    *

BANK OF AMERICA CORPORATION;    *

JPMORGAN CHASE BANK,    *

NATIONAL ASSOCIATION, which    *

acquired and is a s/b/m with    *

CHASE HOME FINANCE, LLC s/b/m    *

with CHASE MANHATTAN    *

MORTGAGE CORP.;    *

JPMORGAN CHASE BANK,    *

NATIONAL ASSOCIATION, which    *

acquired and is a s/b/m with    *

WASHINGTON MUTUAL BANK f/k/a    *

WASHINGTON MUTUAL BANK, FA;    *

MORTGAGE INVESTORS    *

CORPORATION (OHIO);    *

PNC BANK, NATIONAL ASSOCIATION *

s/b/m with NATIONAL CITY REAL    *

ESTATE SERVICES, LLC s/b/m with    *

**CIVIL ACTION FILE NO.**

**1:06-CV-0547-MHS**

**FILED UNDER SEAL**

**RELATORS' SECOND
AMENDED COMPLAINT
BY RESTATEMENT**

NATIONAL CITY MORTGAGE, INC.,    *
f/k/a NATIONAL CITY MORTGAGE CO., *
which also did business as    *
COMMONWEALTH UNITED    *
MORTGAGE CO.;    *
JPMORGAN CHASE BANK n/k/a    *
JPMORGAN CHASE BANK,    *
NATIONAL ASSOCIATION;    *
FIRST TENNESSEE BANK    *
NATIONAL ASSOCIATION (INC.),    *
which acquired and is a s/b/m with    *
FIRST HORIZON HOME LOAN    *
CORPORATION;    *
IRWIN MORTGAGE CORPORATION;    *
SUNTRUST MORTGAGE, INC.;    *
NEW FREEDOM MORTGAGE    *
CORPORATION n/k/a IFREEDOM    *
DIRECT CORPORATION;    *
GMAC MORTGAGE CORPORATION    *
n/k/a GMAC MORTGAGE, LLC,    *
a subsidiary of GMAC INC., acquired by  *
and n/k/a ALLY FINANCIAL INC.; and  *
CITIMORTGAGE, INC.    *
    *
    DEFENDANTS.    *

## RELATORS' SECOND AMENDED COMPLAINT BY RESTATEMENT

COME NOW, VICTOR E. BIBBY and BRIAN J. DONNELLY,

Plaintiffs/Relators, in the above-styled action, by and through counsel of record,

Butler, Wooten & Fryhofer LLP, Wilbanks & Bridges LLP, and Phillips and

Cohen LLP and file this their Second Amended Complaint in substitution for the previously filed First Amended Complaint.

## **INTRODUCTION**

1.

This is an action to recover damages and civil penalties on behalf of the United States of America arising from false and/or fraudulent records, statements and claims made and caused to be made by Defendant lenders and/or their agents, employees, and co-conspirators in violation of the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.*

2.

Defendants have engaged in a brazen scheme to defraud both our nation's veterans and the United States treasury of millions of dollars in connection with home loans guaranteed by the United States Department of Veterans Affairs ("VA").

3.

To allow veterans to take advantage of low interest rates, while also protecting those veterans from the predations of unscrupulous lenders, Congress authorized and the VA established the Interest Rate Reduction Refinancing Loans ("IRRRL loans") program. Through this program, veterans are allowed to

3

refinance their existing VA home loans.  The program is designed to protect veterans from paying excessive fees and charges in the refinancing transaction.

4.

Defendant lenders have repeatedly violated the rules of the IRRRL program. Rather than comply with those rules, Defendant lenders over-charged veterans, charged unallowable fees, and then deliberately concealed those facts from the VA to obtain taxpayer-backed guarantees for the loans, which would not have been available but for that concealment.  At the same time, Defendant lenders falsely certified to the VA, in writing, that they were *not* charging unallowable fees.

5.

Defendant lenders have submitted hundreds of thousands of false and fraudulent documents, records and claims to the United States to fraudulently induce the VA to guarantee IRRRL loans.  Tens of thousands of those IRRRL loans have gone into default or resulted in foreclosure, which has resulted in massive damages.  Under the False Claims Act, Defendant lenders are liable to the United States for all damages resulting from those fraudulently induced guarantees of IRRRL loans, as well as penalties of up to $11,000 for each violation of the False Claims Act.

4

## THE PARTIES

6.

VICTOR E. BIBBY ("Relator Bibby") is President and CEO of U.S. Financial Services, Inc. d/b/a Veteran's Mortgage Company. U.S. Financial Services is a Georgia corporation which operates offices and provides mortgage services as a licensed mortgage broker in seven (7) U.S. states (Georgia, Florida, Alabama, South Carolina, North Carolina, Tennessee and Texas).

7.

BRIAN J. DONNELLY ("Relator Donnelly") is Vice-President of Operations of U.S. Financial Services, Inc. d/b/a Veteran's Mortgage Company ("U.S. Financial"). He is a licensed mortgage loan officer in Georgia, North Carolina and Tennessee.

8.

Relator BIBBY resides in Fulton County, Georgia. Relator DONNELLY resides in Cherokee County, Georgia. They bring this *qui tam* action based upon direct and unique information they possess with regard to the specific fraudulent acts of Defendants set forth and described with particularity hereafter.

## DEFENDANTS

9.

Defendant WELLS FARGO BANK, NATIONAL ASSOCIATION (INC.), individually and as s/b/m[1] with WELLS FARGO HOME MORTGAGE, INC. (hereinafter referred to as "Defendant Wells Fargo") is a foreign corporation operating as a financial services institution, whose business is in part the making of VA home loans, guaranteed by the United States Government.  Defendant Wells Fargo during all relevant times hereafter described, did transact, and does now presently transact, lending business in the State of Georgia and within the Northern District of Georgia.  Defendant Wells Fargo maintains a principal office address at 101 N. Phillips Avenue, Sioux Falls, SD 57104 and may be served through its registered agent Corporation Service Company at 40 Technology Parkway South, Suite 300, Norcross, GA 30092.

10.

Defendant COUNTRYWIDE HOME LOANS, INC. is a foreign corporation with a principal office address of 4500 Park Granada, Calabasas, CA 91302-1613. Defendant COUNTRYWIDE HOME LOANS SERVICING, LP n/k/a BAC HOME LOANS SERVICING, LP is a foreign limited partnership with a principal

---

[1] "s/b/m" means "successor by merger."

6

office address of 7105 Corporate Drive, Plano, TX 75024. Defendants

COUNTRYWIDE HOME LOANS, INC. and BAC HOME LOANS SERVICING,

LP (hereinafter referred to collectively as "Defendants Countrywide") are affiliated

financial services institutions, whose business is in part the making of VA home

loans, guaranteed by the United States Government. Defendants Countrywide

during all relevant times hereafter described did transact, and do now presently

transact, lending business in the State of Georgia and within the Northern District

of Georgia. Defendants Countrywide may be served through their registered agent

C T Corporation System at 1201 Peachtree Street, NE, Atlanta, GA 30361.

11.

Defendant BANK OF AMERICA CORPORATION, individually and as

successor-in-interest to Defendants Countrywide (hereinafter referred to as

"Defendant Bank of America"), a foreign corporation, is a financial services

institution, whose business is in part the making of VA home loans, guaranteed by

the United States Government. Defendant Bank of America has a principal office

address of 401 N. Tryon Street, NC1-021-02-20, Charlotte, NC 28255-0001.

Defendant Bank of America, individually and through its predecessors Defendants

Countrywide, during all relevant times hereafter described did transact, and does

now presently transact, its lending business in the State of Georgia and within the

7

Northern District of Georgia.  Defendant Bank of America may be served through

its registered agent CT CORPORATION SYSTEM/SHAKINAH EDWARDS at

1201 Peachtree Street, NE, Atlanta, GA 30361.

12.

Defendant JPMORGAN CHASE BANK, NATIONAL ASSOCIATION,

which acquired and is a s/b/m with CHASE HOME FINANCE, LLC s/b/m with

CHASE MANHATTAN MORTGAGE CORP., (hereinafter referred to as

"Defendant JPMorgan Chase" or "Defendant Chase Mortgage"), a foreign

corporation, is a financial services institution, whose business is in part the making

of VA home loans, guaranteed by the United States Government.  Defendant

JPMorgan Chase and its predecessors during all relevant times hereafter described

did transact, and Defendant JPMorgan Chase does now presently transact, lending

business in the State of Georgia and within the Northern District of Georgia.

Defendant JPMorgan Chase maintains a principal office address of 270 Park

Avenue, 39th Floor, New York, NY 10017 and may be served through its

registered agent C T CORPORATION SYSTEM at 1201 Peachtree Street NE,

Atlanta, GA 30361.

8

13.

Defendant JPMORGAN CHASE BANK, NATIONAL ASSOCIATION,

which acquired and is a s/b/m with WASHINGTON MUTUAL BANK f/k/a

WASHINGTON MUTUAL BANK, FA (hereinafter referred to as "Defendant

JPMorgan Chase" or "Defendant Washington Mutual"), a foreign corporation, is a

financial services institution, whose business is in part the making of VA home

loans, guaranteed by the United States Government. Defendant JPMorgan Chase

and its predecessors during all relevant times hereafter described did transact, and

Defendant JPMorgan Chase does now presently transact, lending business in the

State of Georgia and within the Northern District of Georgia. Defendant

JPMorgan Chase maintains a principal office address of 270 Park Avenue, 39th

Floor, New York, NY 10017 and may be served through its registered agent C T

CORPORATION SYSTEM at 1201 Peachtree Street NE, Atlanta, GA 30361.

14.

Defendant MORTGAGE INVESTORS CORPORATION (OHIO), a foreign

corporation (hereinafter referred to as "Defendant Mortgage Investors") is a

financial services institution, whose business is in part the making of VA home

loans, guaranteed by the United States Government. Defendant Mortgage

Investors has a principal office address of 6090 Central Avenue, St. Petersburg, FL

9

33707-1622.  Defendant Mortgage Investors during all relevant times hereafter

described did transact, and does now presently transact, its lending business in the

State of Georgia and within the Northern District of Georgia.  Defendant Mortgage

Investors may be served through its registered agent CORPORATE CREATIONS

NETWORK, INC. at 2985 Gordy Parkway, 1st Floor, Marietta, GA 30068.

15.

Defendant PNC BANK, NATIONAL ASSOCIATION s/b/m with

NATIONAL CITY REAL ESTATE SERVICES, LLC s/b/m with NATIONAL

CITY MORTGAGE, INC., f/k/a NATIONAL CITY MORTGAGE CO., which

also did business as COMMONWEALTH UNITED MORTGAGE CO.

(hereinafter referred to as "Defendant National City" or "Defendant PNC Bank"), a

foreign corporation, is a financial services institution, whose business is in part the

making of VA home loans, guaranteed by the United States Government.

Defendant PNC Bank has a principal office address of 222 Delaware Ave.,

Wilmington, Delaware 19899.  Defendant National City and its successors during

all relevant times hereafter described did transact, and do now presently transact,

lending business in the State of Georgia and within the Northern District of

Georgia.  Defendant PNC Bank may be served via registered or certified mail or

statutory overnight delivery addressed to the chief executive officer, chief financial

10

officer, or secretary at its principal office at 222 Delaware Ave., Wilmington,

Delaware 19899, and via registered or certified mail or statutory overnight delivery

addressed to the chief executive officer, chief financial officer, or secretary at the

principal office of its parent company, the PNC Financial Services Group, Inc., at

249 Fifth Ave., One PNC Plaza, Pittsburgh, PA 15222.

16.

Defendant JPMORGAN CHASE BANK n/k/a JPMORGAN CHASE

BANK, NATIONAL ASSOCIATION (hereinafter referred to as "Defendant

JPMorgan Chase"), a foreign corporation, is a financial services institution, whose

business is in part the making of VA home loans, guaranteed by the United States

Government.  Defendant JPMorgan Chase has a principal office address of 270

Park Avenue, 39th Floor, New York, NY 10017.  Defendant JPMorgan Chase

during all relevant times hereafter described did transact, and does now presently

transact, its lending business in the State of Georgia and within the Northern

District of Georgia.  Defendant JPMorgan Chase may be served through its

registered agent C T Corporation System at 1201 Peachtree Street, NE, Atlanta,

GA 30361.

11

17.

Defendant FIRST TENNESSEE BANK NATIONAL ASSOCIATION (INC.), which acquired and is a s/b/m with FIRST HORIZON HOME LOAN CORPORATION (hereinafter referred to as "Defendant First Tennessee" or "Defendant First Horizon"), a foreign corporation, is a financial services institution, whose business is in part the making of VA home loans, guaranteed by the United States Government.  Defendant First Tennessee has a principal office address of 165 Madison Ave., 8th Floor, Memphis, TN 38103.  Defendant First Horizon and its successor during all relevant times hereafter described did transact, and currently do transact, lending business in the State of Georgia and within the Northern District of Georgia.  Defendant First Tennessee may be served through its registered agent C T Corporation System at 1201 Peachtree Street, NE, Atlanta, GA 30361.

18.

Defendant IRWIN MORTGAGE CORPORATION (hereinafter referred to as "Defendant Irwin Mortgage"), a foreign corporation, is a financial services institution, whose business is in part the making of VA home loans, guaranteed by the United States Government.  Defendant Irwin Mortgage during all relevant times hereafter described did transact its lending business in the State of Georgia

12

and within the Northern District of Georgia. Defendant Irwin Mortgage maintains

a principal office address of 6375 Riverside Drive, Suite 200, Dublin, Ohio 43017

and may be served via registered or certified mail or statutory overnight delivery

addressed to the chief executive officer, chief financial officer, or secretary at its

principal office, 6375 Riverside Drive, Suite 200, Dublin, Ohio 43017.

19.

Defendant SUNTRUST MORTGAGE, INC. (hereinafter referred to as

"Defendant SunTrust Mortgage"), a foreign corporation, is a financial services

institution, whose business is in part the making of VA home loans, guaranteed by

the United States Government. Defendant SunTrust Mortgage has a principal

office address of 901 Semmes Avenue, Richmond, Virginia 23224-2270.

Defendant SunTrust Mortgage during all relevant times hereafter described did

transact, and does now presently transact, its lending business in the State of

Georgia and within the Northern District of Georgia. Defendant SunTrust

Mortgage may be served through its registered agent Corporation Service

Company, Inc. at 40 Technology Parkway South, #300, Norcross, GA 30092.

20.

Defendant NEW FREEDOM MORTGAGE CORPORATION n/k/a

IFREEDOM DIRECT CORPORATION (hereinafter referred to as "Defendant

13

Freedom Mortgage"), a foreign corporation, is a financial services institution whose business is in part the making of VA home loans, guaranteed by the United States Government. Defendant Freedom Mortgage has a principal office address of 2363 Foothill Drive, Salt Lake City, UT 84109-1403. Defendant Freedom Mortgage during all relevant times hereafter described did transact, and does now presently transact its lending business in the State of Georgia and within the Northern District of Georgia. Defendant Freedom Mortgage may be served through its registered agent CT CORPORATION SYSTEM/SHAKINAH EDWARDS at 1201 Peachtree Street, NE, Atlanta, GA 30361.

21.

Defendant GMAC MORTGAGE CORPORATION n/k/a GMAC MORTGAGE, LLC, a subsidiary of GMAC INC., acquired by and n/k/a ALLY FINANCIAL INC. (hereinafter referred to as "Defendant Ally Financial" or "Defendant GMAC"), a foreign corporation, is a financial services institution, whose business is in part the making of VA home loans, guaranteed by the United States Government. Defendant GMAC has a principal office address of 1100 Virginia Drive, Fort Washington, PA 19034. Defendant GMAC during all relevant times hereafter described did transact, and does now presently transact, its lending business in the State of Georgia and within the Northern District of Georgia.

14

Defendant GMAC may be served through its registered agent Corporation Service Company at 40 Technology Parkway South, Suite #300, Norcross, GA 30092.

22.

Defendant CITIMORTGAGE, INC., a New York corporation (hereinafter referred to as "Defendant Citimortgage"), a foreign corporation, is a financial services institution, whose business is in part the making of VA home loans, guaranteed by the United States Government.  Defendant Citimortgage has a principal office address of P.O. Box 30509, Tampa, FL 33631.  Defendant Citimortgage during all relevant times hereafter described did transact, and does now presently transact, its lending business in the State of Georgia and within the Northern District of Georgia.  Defendant Citimortgage may be served through its registered agent C T CORPORATION SYSTEM at 1201 Peachtree Street, NE, Atlanta, GA 30361.

### JURISDICTION AND VENUE

22.

23.

This Court has jurisdiction over this *qui tam* action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. §§ 3732(a) and 3730(b).  Relators are the original source of the facts and details contained in this Second Amended Complaint and institute

•

15

this action in the name of the United States of America as contemplated by the

Civil False Claims Act, 31 U.S.C. §§ 3729-33 ("False Claims Act").

24.

Venue is appropriate as to each Defendant lender, in that each of the

Defendants can be found in, reside in, and/or transact business in this judicial

district.  Additionally, acts proscribed by the False Claims Act have been

committed by one or more of the Defendants in this judicial district.  Therefore,

within the meaning of 28 U.S.C. § 1391(c) and 31 U.S.C. § 3732(a), venue is

proper.

25.

Relators have presented the Government with timely disclosures regarding

the False Claims Act violations described herein as required by 31 U.S.C. § 3730

(b)(2).

## APPLICABLE LAW

26.

31 U.S.C. § 3729(a)(1)(A) provides that any person who knowingly presents

or causes to be presented to the United States any false or fraudulent claim for

payment or approval is liable to the United States Government both for a civil

penalty and for three times the amount of damages which the Government sustains

16

because of the act of that person. The current civil penalty is not less than $5,500 and not more than $11,000 per false claim made. 20 C.F.R. § 356.3.

27.

31 U.S.C. § 3729(a)(1)(B) provides that any person who knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim is liable to the United States Government both for a civil penalty and for three times the amount of damages which the Government sustains because of the act of that person. The current civil penalty is not less than $5,500 and not more than $11,000 per false claim made. 20 C.F.R. § 356.3.

28.

The False Claims Act defines a "claim" to include any request or demand made upon an agency of the United States for payment of money. 31 U.S.C. § 3729(b)(2). As a result of foreclosures of IRRRL loans, Defendant lenders have made such claims upon the Government. As a result of their notification to the VA of defaults of IRRRL loans which did not result in foreclosures, Defendant lenders have caused the Government to expend substantial sums which also amount to a "claim." A false claim exists whenever the United States incurs any cost or is asked to pay any amount in connection with a fraudulently induced guaranty.

29.

No proof of specific intent to defraud is required to prove a False Claims Act violation. The terms "knowing" and "knowingly" are defined to mean that a person (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information. 31 U.S.C. § 3729(b)(1).

## BACKGROUND

30.

IRRRL loans are provided to retired or active duty veterans to refinance homes they already own. IRRRL loans are available to all veterans who currently have a VA home loan. The program is designed to give veterans the opportunity to lower their current interest rates or shorten the terms of existing home mortgages. *See* 38 C.F.R. § 36.4223.

31.

Because the loans are for veterans, and because the loans are for lower refinancing payments, and because the loans are guaranteed by the taxpayers, both the type and amount of fees that can be imposed by lenders are strictly limited.

18

32.

The IRRRL guarantees obligate the United States Government to incur monetary expenses and pay monetary claims to lenders after default, if and when a default occurs.

33.

Insuring that veterans are not burdened with excessive fees is one of the primary aims of the IRRRL loans.  The official policy is explicit, unambiguous, and published to lenders:

> The VA home loan program involves a veteran's benefit.  VA policy has evolved around the objective of helping the veteran to use his or her home loan benefit.  Therefore, VA regulations limit the fees that the veteran can pay to obtain a loan.

*See* VA Pamphlet 26-7, Ch. 8, 8-2.  Because of this policy, the VA has stated that "[l]enders must *strictly adhere* to the limitation on borrower-paid fees and charges when making VA loans." *Id.* (emphasis added).  This policy is violated when the lender charges unallowable fees to the veteran, circumventing the underlying objectives of the VA IRRRL Loan Guaranty Program.

19

34.

Because the amount of fees that can be charged are limited by law, lenders

and/or the lenders' brokers originating IRRRL loans may only receive a "flat

charge not exceeding 1 percent of the amount of the loan" as fees. 38 C.F.R.

§ 36.4313(d)(2). (Lenders typically refer to this as the "origination fee.") In

addition to that 1% "flat charge," lenders may also charge "reasonable and

customary amounts" for certain specified other costs actually incurred by the

lenders. *Id.* at § 36.4313(d)(1). Those allowable fees which the lenders may

charge include things such as "recording fees and recording taxes," fees for a

"credit report," and fees for "title examination and title insurance." *Id.* Lenders

may also charge for those fees which must be paid to the VA. *Id.* at § 36.4313(e).

The specified allowable fees that may be charged to a veteran in an IRRRL loan do

not include "attorneys fees."

35.

VA rules specify that "the lender may not charge the borrower [veteran] for

attorneys fees." VA Pamphlet 26-7, Ch. 8, 8-8.

36.

Lenders and/or their brokers almost always charge the 1% "flat charge."

When they do, lenders may not charge separately for attorneys fees, because doing

so would cause the "flat charge" to exceed the maximum 1%. *See* VA Pamphlet 26-7, Ch. 8, 8-8.

37.

Lenders are required to affirmatively represent to the VA, by written certifications that they have fully complied with the law and with VA rules and regulations in processing an IRRRL loan. The lender's written certifications are a condition precedent to the VA's issuance of a loan guaranty.

38.

If a lender charges unallowable fees, or charges more than the maximum 1% "flat charge" on an IRRRL loan, the lender is not entitled to a taxpayer-backed guaranty. The federal law is explicit:

> *No charge shall be made* against, or paid by, the borrower incident to the making of a guaranteed or insured loan other than those expressly permitted under paragraph (d) [e.g. recording fees, credit report, title examination fees and title insurance] or (e) [fees payable to the VA] of this section, and *no loan shall be guaranteed* or insured unless the lender certifies to the Secretary that it has not imposed and will not impose any charges or fees against the borrower in excess of those permissible under paragraph (d) or (e) of this section.

21

38 C.F.R. § 36.4313(a) (emphasis added).

39.

Lenders regularly and routinely lie to the Government.  Lenders regularly and routinely charge the veterans for attorneys fees and impose charges in excess of the maximum 1% "flat charge," exclusive of those allowable fees specified by subsections (d) and (e).  Lenders regularly and routinely hide those excessive charges on the standard forms which lenders are required to provide to the VA. For example, lenders regularly and routinely inflate the charge for "title examination fees" above the "reasonable and customary amounts" of such examinations by adding the attorneys fees to the amount which the lender has represented to the veteran and to the VA that was attributable to "title examination fees" or to some other allowable fee.  The lenders conceal that conduct from the VA and from the veteran who is taking out the loan.  Each Defendant lender is guilty of such misconduct.

40.

By paying unallowable attorneys fees to the lender's closing attorney from the IRRRL loan proceeds, the lenders charged those fees to the veteran.

22

41.

By paying attorneys fees from the loan proceeds, the lenders almost always took more than the maximum allowable 1% "flat charge."

42.

No loan with respect to which such misconduct has occurred qualifies for a taxpayer-backed guaranty.

43.

As a matter of law, any loan with respect to which the lender has imposed charges or fees against the borrower "in excess of those permissible" by law "shall" not be entitled to a taxpayer-backed guaranty, and any guaranty issued with respect to such loan is void.  38 C.F.R. § 36.4313(a).

44.

Federal regulations prohibit the VA from guaranteeing an IRRRL loan where the lender has imposed fees against the borrower "in excess of those permissible" by law and where the lender has falsely certified its compliance with the law.

45.

Lenders have deceived the Government and the veterans for the express purpose of obtaining a taxpayer-backed guaranty which the lenders knew they were not legally entitled to obtain.

46.

After IRRRL loans have gone into default, lenders have presented claims to the Government based upon guarantees which the lenders knew were obtained by the lenders' fraud.

47.

Ignorant of the lenders' misconduct and of the fact loans tainted by lender misconduct did not qualify for a guaranty, the Government has, through the VA, paid lenders based on guarantees which should not have been issued. When the VA loans are refinanced under the IRRRL program, thousands of dollars of expenses associated with each IRRRL are added to the loan balance guaranteed by the Government.

48.

According to data submitted by the VA to Congress, the VA has paid more than $2.5 billion dollars in guaranty claims on direct and IRRRL loans to lenders since 2001.

24

49.

In addition to paying lenders based on guarantees that should never have been issued, the Government has, through the VA, incurred enormous expenses and administrative costs on improperly guaranteed loans, after receiving notice of default from the lenders.

50.

Those losses to the taxpayers resulted directly from guarantees that the Defendant lenders obtained illegally from the Government. The guarantees were based upon the lenders' false representations to the Government that the lenders had complied with the law and had not imposed charges or fees in excess of those permissible.

51.

The imposition of unallowable charges combined with the false certifications of compliance for the purpose of illegally obtaining a taxpayer-backed guaranty is a violation of the False Claims Act.

## **OPERATIVE FACTS**

52.

The following is a brief description of the typical process which results in an IRRRL loan backed by a VA-issued guaranty issued to the lender.

(a)    A veteran borrower contacts a lender or licensed mortgage broker (such as U.S. Financial Services) to originate the loan.

(b)    If a broker is involved, the broker works with the veteran to complete a loan application and assists in gathering the documentation required by the lender.

(c)    Before a broker can originate a loan, the broker must be sponsored by an approved VA lender.  If a lender originates the loan, no broker is needed.

(d)    The lenders – not the brokers – actually make and service IRRRL loans.

(e)    The lender must approve the loan application and approve the IRRRL loan prior to closing.

(f)    It is the lender's responsibility to make sure the loan conforms to all federal regulations and VA guidelines governing the IRRRL program. The lenders are not supervised by the VA.  The lenders are required to properly educate and supervise their employees regarding the legal requirements established by Congress and the VA in order to participate in the IRRRL program.

26

(g)     After the lender has approved the loan and the loan documentation,
        the lender gives closing instructions to the attorney or title company
        handling the closing for the lender.

(h)     The lender or its agent prepares a HUD-1 statement ("HUD form").
        The HUD form lists all of the closing costs and fees.  The lender must
        review for accuracy and confirm the information reflected on the
        HUD form before the closing occurs.  After that approval, the lender's
        closing agent closes the loan in accordance with specific instructions
        provided by the lender.

(i)     When the loan is closed, the lender sends a copy of the HUD form to
        the VA.  The lender certifies the accuracy of the loan documentation
        to the VA through the use of VA Form 26-1820, "Loan Report and
        Certification of Loan."  This form requires that the lender specifically
        certify to the VA that there are no unallowable charges and the law
        has been followed.

(j)     The veteran has three days to rescind or cancel the loan after the
        closing.  If the loan is not cancelled, the attorney/title company
        completes the funding of the loan with the wired funds provided by
        the lender.

(k)     The VA then issues a Government guaranty to the lender, explicitly

predicated upon the lender's written certifications of compliance with

the law.  No guaranty can be issued unless the lender expressly

certifies to the Government that its representations are accurate and

truthful.

53.

The HUD form is the key document.  Lenders are required to complete that

document and to certify to the VA that it is accurate and truthful.  The HUD form

has "lines" on which the lender is required to reveal what actual costs it has

incurred and is charging for specific items delineated on every HUD form.  For

example, attorneys fees are to be disclosed on Line 1107; title search fees are to be

disclosed on Line 1102; and title examination fees are to be disclosed on Line

1103.

54.

U.S. Financial Services specializes in the brokering and origination of VA

loans, including IRRRL loans.  The company has originated thousands of VA

IRRRL loans in seven states since 2001.  Relators Bibby and Donnelly have

originated IRRRL loans for U. S. Financial Services since 2001.

28

55.

As a broker, Relators work directly with veteran borrowers and coordinate the loan refinancing process on the veteran borrower's behalf. Brokers help the veteran borrower choose an approved lender and complete the application the lender requires from the veteran.

56.

The lenders instruct brokers such as the Relators how to prepare the loan package for an IRRRL loan. One form lenders require that brokers prepare is the "Good Faith Estimate" of fees and charges. The "Good Faith Estimate" is part of the veteran's loan package but is not sent to the VA. It was Relators' practice to show on the "Good Faith Estimate" form the anticipated charges for attorneys fees. The lender would then be responsible for including the actual amount for attorneys fees on the HUD form. The lenders, however, would alter the HUD form to remove the reference to charges for attorneys fees. The lenders would inflate the fee charged for "title examination" or for "title search" by the amount charged for attorneys fees -- thereby hiding the attorneys fees charge by bundling such unallowable fees into an allowable fee.

57.

Subsequently, lenders instructed Relators not to show an amount charged for

29

attorneys fees on the "Good Faith Estimate" at all, but directed Relators to add attorneys fees to the charge shown for "title examination fee."

58.

Suspicious of such actions and instructions from the lenders, Relators contacted the VA for guidance. The VA told Relators to refer to the VA Lender Handbook for program guidelines.

59.

The VA Lender Handbook is a compilation of the federal regulations and VA guidelines that govern what charges and fees are allowed and not allowed for VA IRRRL loans.

60.

After reviewing the VA Lender Handbook, Relators learned for the first time that the lenders were not truthfully reporting costs and charges on HUD forms. The VA Lender Handbook specifies that all charges and fees imposed on the veteran/borrower by a lender are capped at 1% of the loan amount (referred to as the "flat charge" or "loan origination fee"), except for certain allowable charges and fees listed in 38 C.F.R. § 36.4313(d) and (e). "Attorneys fees" are not listed as an allowable fee. Thus any such attorneys fees charged to the veteran/borrower must come out of the 1% "flat charge" allowed by the regulations. Fees for "title

30

examination" are, however, a specifically allowed additional charge. The *actual*
amount paid for the title examination is supposed to be reported separately on Line
1103 of the HUD form. The *actual* amount paid for the title search is supposed to
be reported separately on Line 1102 of the HUD form.

61.

VA regulations prohibit a lender from charging more than a reasonable and
customary amount to have title work done. 38 U.S.C. § 36.4313(d)(1)(vii)
(referring to "title examination"). The actual cost of title work (title examination
or title search) ranges from approximately $125.00 to $200.00 (according to
regional and national data that track title examination and title search fees across
the United States). Relators have closed thousands of IRRRL loans. They also
have reviewed numerous fee sheets and written quotes from closing attorneys and
title companies specifying actual fees for title work for VA loans. Through that
experience and based upon that review, Relators have determined that Defendant
lenders have been charging veterans for title work in excess of their actual costs.
Lenders have inflated the amounts attributed to either "title examination" or "title
search" for the purpose of hiding that they were charging veterans for unallowable
attorneys fees and other fees.

31

62.

For years, Defendant lenders misled Relators. Defendant lenders reported

that attorneys fees and other unallowable fees were "allowable" charges, even

when the 1% origination fee was exceeded. That was false.

63.

Rather than using the lines on the HUD form for "title examination" and

"title search" to accurately report the actual cost of title work, Defendant lenders

have been and are including undisclosed attorneys fees and other unallowable fees

in the amounts they represent for "title examination" or for "title search." In other

words, Defendant lenders are fraudulently reporting costs and fees in excess of

what should be listed on Lines 1102 and 1103. The result is that lenders report, on

Lines 1102 and 1103 of the HUD forms, charges supposedly incurred for title

examination and title search fees in amounts ranging from $525 to $1200, when in

fact the total cost of title examination and title search fees should amount to only

$125 to $200. By that deceit, lenders have improperly lumped unallowable costs

with allowable costs. The intended result is that the veteran/borrower is charged

excessive and illegal fees at closing.

64.

For example, a sample HUD form with notations showing this lender fraud

is attached as Exhibit A.  Exhibit A shows that Defendant Wells Fargo did not properly report the amount paid for attorneys fees on the HUD form.  Line 1107 should have been used to report the actual attorneys fees, but Defendant Wells Fargo does not report attorneys fees on Line 1107.  Instead, Defendant Wells Fargo improperly bundled the attorneys fees with the title examination fee.  The Defendant lender reported $950 for the title examination fee on Line 1103, but a reasonable and customary fee for title examination should be in the range of $125-$200.  Although Exhibit A shows only an example for Defendant Wells Fargo, similar examples exist for each of the other Defendant lenders.

65.

Although brokers, such as Relators, do not attend the closings or prepare HUD forms, the lender sends the brokers a copy of the HUD form after the loan closes.  By examining the HUD form after the closing, Relators could see how the lenders were concealing illegal charges to the veteran.

66.

Relators also discovered that Defendant lenders' illegal dumping of unallowable fees was not limited to Lines 1102 and 1103 of the HUD form.  The lenders also concealed unallowable charges on lines of the HUD form intended for other allowable fees.

33

67.

The most typical unallowable charge that was bundled in with charges on Line 1102 or 1103 was attorneys fees. Any attorneys fees paid should have been listed on Line 1107 of the HUD forms. The vast majority of the IRRRL loans which contained unallowable charges simply left Line 1107 blank – thereby representing to the VA and to the veteran that no attorneys fees were incurred or charged. That was false. The attorneys fees were illegally added by the lender to Lines 1102 or 1103 – which were lines on the HUD form specifically designed for the reporting of other fees or charges, not for attorneys fees. That deceptive practice is a False Claims Act violation.

68.

In their investigation, Relators reviewed hundreds of specific HUD forms prepared by Defendant lenders' closing agents and found HUD forms where the lender's attorneys fees were hidden and not disclosed on Line 1107 or anywhere else on the HUD form. The lenders hid those attorneys fees by adding the amount for attorneys fees to other lines on the HUD form, which were intended to disclose other fees or charges which were legal and allowable. Relators have identified such fraudulent transactions committed by each of the Defendant lenders.

34

69.

Lenders are required to certify to the VA that no such attorneys fees or other unallowable fees were charged to the veteran. Lenders did so, but those written certifications were false.

70.

Lenders are required to disclose any attorneys fees incurred by them, even though lenders cannot legally charge the veteran for those fees as part of the loan amount. Lenders did not disclose the fees paid to the closing attorneys to the veteran or to the VA.

71.

The result of lenders hiding attorneys fees and falsely inflating other costs and charges on the HUD form is that on average $400 or more is stolen from the veteran at the time of closing and paid out of the loan proceeds. This means that the amount of the IRRRL loan being guaranteed by the U. S. taxpayers is illegally inflated by $400 or more per loan closing.

72.

The Government incurs costs for these IRRRL loans when they go into default.

73.

If an IRRRL loan goes into default, after the 61st day of non-payment, the VA regulations require the lender to notify the veteran borrower and the VA that the loan is in default. The lender and the VA then commence intervention activities that cause the VA to expend resources and money.

74.

The VA uses several different intervention approaches when an IRRRL loan goes into default. The VA may opt to: (1) work with the borrower to cure the delinquency/default; (2) pursue forbearance, reamortization, modification and/or repayment; (3) provide VA financial assistance; (4) authorize the private sale of the property, with the VA paying part of the loan balance based upon the guaranty; (5) obtain a deed in lieu of foreclosure from the veteran borrower, with the VA paying off the guaranteed loan in part; (6) authorize the lender to foreclose so the VA can then purchase the foreclosed property from the lender for the loan amount; or (7) allow foreclosure and pay the lender under the terms of the guaranty.

75.

The VA also reimburses the servicing lender for costs incurred by the lender to protect the collateral during the default process. An intervention in the post-default scenario by the lender can also entitle the lender to receive a bonus from

36

the VA for success in dealing with the default. That means the Government incurs damage post-default on IRRRL loans, even if the default is ultimately cured. It is a fact that the Government has incurred enormous expenses on guaranteed loans after default even in those instances when the default was cured prior to foreclosure.

76.

When the lender has charged the veteran borrower for an unallowable cost, and when the lender has falsely certified compliance with express conditions precedent to the issuance of the VA guaranty, a False Claims Act violation has occurred. The False Claims Act claim is complete when the IRRRL loan that was procured through fraud goes into default, requiring the VA to spend funds because of its guaranty exposure. At that point, the Defendant lender is liable for both False Claims Act damages and civil monetary penalties.

77.

After it became known to Relators in late 2005 that IRRRL lenders were defrauding the veterans and the Government, Relators promptly obtained counsel (Wilbanks & Bridges) who notified the Government of the fraudulent schemes. Relators provided explanations and proof to the Government of the illegal overcharging and inclusion of unallowable costs. Relators provided copies of

37

hundreds of HUD forms containing unallowable costs to the Government that proved the lenders were routinely and systematically hiding and shifting fees on IRRRL loans made in multiple states.

## IMPACT OF VA LOAN FRAUD ON AMERICAN TAXPAYERS

78.

Over 1,100,000 IRRRL loans have been guaranteed by the VA from 2001 to the present. According to the Office of Inspector General for the Department of Veterans Affairs ("VA-OIG"), the nationwide default rate for IRRRLs is 18% or higher. The total number of IRRRL loans going into default routinely exceeds 100,000 per year. According to the Government Accounting Office, the average number of IRRRL defaults occurring from 1996 to 2000 was 122,000 per year.

79.

According to reports made annually to Congress, approximately 50% of the VA loans that go into default end up in a foreclosure proceeding. The average cost to the VA from a foreclosed guaranteed loan is approximately $22,000 per loan. The Government losses do not cease when foreclosure occurs. For example, in fiscal year 2009, the VA reported that the cost of managing the foreclosed properties obtained by the Government after default and foreclosure exceeded $16,000 per loan.

80.

The VA goes to great effort to avoid foreclosure on loans issued to veterans. On average, a VA loan in default does not reach foreclosure for over 100 months. During that time period the Government incurs expenses because of its IRRRL guaranty exposure.

81.

Taxpayers have lost massive amounts over the last decade because of expenses incurred on foreclosed IRRRL loans and defaulted IRRRL loans. According to the VA Director of Loan Guaranty Services, the average cost to the VA of a default on an IRRRL loan exceeds $15,000 per loan, even when the VA is successful in avoiding foreclosure. Such "successful" interventions occur in approximately 30-35% of the cases where a default occurs. While these "successful interventions" are better results for the taxpayers than foreclosures, the $15,000 damage per "successful" intervention is still a tremendous loss to the taxpayers.

82.

The losses to the Government are not limited to intervention expenditures or foreclosure costs. One of the most expensive alternatives to foreclosure which the VA frequently elects to pursue is the "refunding" of an IRRRL loan. "Refunding"

39

means the taxpayers actually purchase the entire loan, thereby assuming the entire indebtedness and paying off the lender.  According to published government data, approximately one-half of IRRRL refundings eventually end up in foreclosure, which means the taxpayers absorb the entire loss on that loan, in addition to all the other expenses incident to trying to avoid the foreclosure.

83.

The loss to the United States taxpayers from IRRRL defaults, foreclosures and refundings is staggering.  Each year the VA presents Congress with consolidated financial statements known as Performance and Accountability Reports ("PAR").  These PAR reports provide specific calculations regarding default costs, foreclosure property costs and claim payments to lenders.  The PAR reports submitted to Congress reflect that the taxpayers made payments to lenders on VA guaranteed direct and IRRRL loans in excess of $2.5 billion dollars ($2,500,000,000) from 2001 – 2008.  That figure is going up every day and will continue to do so into the future because IRRRLs are going into default every day and the Government is spending money every day because of loan guarantees, many of which were procured by lender fraud and misrepresentations.

40

84.

The PAR reports also reveal enormous administrative expenses associated

with the VA loan program annually.  The administrative expenses routinely exceed

$100,000,000 per year for VA direct and IRRRL loans.  As a subset of those

administrative costs, the VA annually calculates administrative costs that are

specifically related to defaults processed.  Typically, 25% of the total

administrative costs expended are related to defaulted VA loans.

85.

On or about April 25, 2009, the VA-OIG published an audit of the VA's

Loan Guaranty Program.  Within that audit report, the VA-OIG reported losses

ranging from $10,600,000 in the first quarter of fiscal year 2007 to $32,500,000 for

the third quarter of fiscal year 2008.  In the first three quarters of fiscal year 2008

alone, the taxpayers lost over $67,000,000.

86.

Taxpayers' funds are being squandered because of the fraudulent schemes

committed by Defendants and other lenders, which contaminate thousands of

IRRRL closings with intentional fraud.  Defendant lenders are adding illegal fees

to the IRRRL loans and fraudulently inducing the Government to guarantee the

loans based upon false certifications and misrepresentations.  But for the VA's

41

reliance upon the false written certifications and misrepresentations of the lenders, the VA could not have obligated the taxpayers to act as guarantor for the IRRRL loans at issue.

## DEFENDANT LENDERS PROVIDED MULTIPLE FALSE CERTIFICATIONS AND CLAIMS TO THE VA IN ORDER TO OBTAIN GOVERNMENT GUARANTEES

### A.   LENDER CERTIFICATIONS BEFORE THE LOANS ARE MADE

87.

Each Defendant lender is required to certify compliance with the VA regulations and directives for closing IRRRL loans by submitting VA Form 26-8736 to the VA prior to closing any IRRRL loan.  Form 26-8736 is an application for authority to close IRRRL loans on an automatic non-supervised basis.  This form is required by 38 U.S.C. §§ 3702 and 3710.  As part of the express certifications made in this form, each Defendant lender agreed and certified that it would comply with Title 38 U.S.C., VA regulations and other directives issued by the VA.  Form 26-8736 must be signed by the president or principal officer for each Defendant lender.

88.

Each Defendant lender was also required to submit Form 26-8736a as a condition of participation as an approved lender in the VA's IRRRL Loan Guaranty Program. Each lender must provide an express certification that its underwriter identified on Form 26-8736a is properly trained and qualified. Because the VA does not supervise the lenders' employees who handle the loans, it is crucial that the lenders properly train and oversee its employees and the lenders must so certify in order to participate in the IRRRL program. The Government relies on the lenders to truthfully prepare and submit these forms.

## B. LENDER CERTIFICATIONS MADE DURING THE IRRRL LOAN PROCESS

89.

For each specific IRRRL loan made, the Defendant lender also has to certify on multiple VA Forms that it complied with the applicable VA regulations pertaining to that loan. Lenders must expressly certify that no unallowable charges were imposed upon the veteran borrower. Each Defendant lender submitted fraudulent certifications to the VA falsely claiming they were not charging veterans unallowable fees.

43

90.

Each Defendant lender fraudulently submitted VA Form 26-8923, the "Interest Rate Reduction Refinancing Loan Worksheet," to the VA. This form must be submitted by the lender when a guaranty is requested on an IRRRL loan. On Line 8 of this form, the lender specifically is required to list the "allowable closing costs." Each Defendant lender committed fraud on this form by improperly hiding unallowable attorneys fees or other costs within "allowable" charges on the IRRRL worksheet and then expressly certifying that the information contained was "true, accurate and complete."

91.

Defendant lenders committed other false certifications to the VA on the HUD forms which Defendants prepared and subsequently provided to the borrowers and the VA. On each HUD form, the lender is required to certify that the HUD form is a "true and accurate account of the transaction." For those IRRRLS where unallowable fees are improperly bundled into allowable charges, the certifications to the VA were false.

92.

Defendants also made false statements on VA Form 26-1820, which must be submitted by the lenders to the VA. This form is titled "Report and Certification

44

Upon Disbursement." On Form 26-1820, the lender is required to expressly certify

that it "has not imposed and will not impose any charges or fees against the veteran

borrower in excess of those permissible under the schedule set forth in paragraph

(d) of 38 C.F.R. 36.4312." The lender is further required to expressly certify that

the information provided to the VA regarding the loan is accurate and complete.

Defendant lenders are also required to certify that "[t]he loan conforms with the

applicable provisions of Title 38, U.S. Code and the Regulations concerning

guaranty or insurance of loans to veterans."

93.

For those IRRRL loans with respect to which unallowable fees were charged

to veterans, the written certifications by Defendant lenders on each of the above-

mentioned VA forms were false.

94.

The stakes are high for lenders who use false information to obtain

Government guarantees. Numerous federal laws are violated when any lender

intentionally provides false certifications and/or adds illegal fees to a Government

guaranteed loan. Form 26-1820 itself explicitly warns lenders that:

> Federal Statutes provide severe penalties for any fraud, intentional
>
> misrepresentation, or Criminal Connivance or conspiracy purposed to

45

influence the issuance of any guaranty or insurance by the Department

of Veterans Affairs.

VA Form 26-1820.

### C.   **POST-CLOSING CERTIFICATIONS**

95.

When an IRRRL loan is at least 61 days into default, the lenders complete

VA Form 26-6850 and forward it to the VA.  This is the "Notice of Default"

("NOD").  The information in Form 26-6850 is required so the VA can "determine

compliance with the applicable reporting requirements of VA regulations."  Form

26-6850.  When a lender sends a NOD to the VA on a loan for which the guaranty

was fraudulently obtained, the submission of a false claim occurs.

96.

Additional forms which lenders must submit to the VA after closing require

the lender to provide the VA with accurate information regarding the outstanding

loan and default balances:

VA Form 26-6850(a), "Notice of Default and Intention to Foreclose";

VA Form 26-1874, "Claim Under Loan Guaranty"; and

VA Form 26-567, "Status of Loan Account – Foreclosure or Other

Liquidation."

At the bottom of Form 26-1874, each lender is warned:

> PENALTY:  Federal statutes provide severe penalties for any fraud,
> intentional misrepresentation, or criminal connivance or conspiracy in
> making any claim upon or against the Government of the United
> States, or any department or officer thereof, in obtaining or aiding to
> obtain the payment or approval of such claim.

VA Form 26-1874.

For those loans where veterans are charged unallowable fees, the amounts reported
to the VA are inaccurate and fraudulent, because the amounts include illegal fees –
a fact known to the lenders, but concealed from the veterans and the Government.

## PROOF OF EACH DEFENDANT'S FALSE CLAIM

97.

Relators have attached to this Second Amended Complaint a chart, Exhibit
B, which includes a specific example whereby Defendant lenders have presented
false claims to the Government.

98.

As discussed previously, Exhibit A shows a specific example of a false
claim from Defendant Wells Fargo.  This IRRRL loan is also referenced in Exhibit
B.  This example shows that Defendant Wells Fargo did not properly report the

actual amount paid for attorneys fees on the HUD form. Instead, Defendant Wells Fargo improperly bundled the attorneys fees into the "title examination" fee. For the referenced loan, Defendant Wells Fargo reported $950 as its cost for "title examination," but a reasonable and customary fee for a title examination is in the range of $125-$200.

99.

Defendant Countrywide has submitted similar false claims. In its IRRRL loan referenced in Exhibit B, Defendant Countrywide did not properly report the actual amount paid for attorneys fees on the HUD form. Instead, Defendant Countrywide improperly bundled the attorneys fees into the "title search" fee. Defendant Countrywide reported $440 as its cost for "title search," but a reasonable and customary fee for a title search is in the range of $125-$200.

100.

Defendant Chase Mortgage has submitted similar false claims. In the IRRRL loan referenced in Exhibit B, Defendant Chase Mortgage did not properly report the actual amount paid for attorneys fees on the HUD form. Instead, Defendant Chase Mortgage improperly bundled the attorneys fees into the "title examination" fee. Defendant Chase Mortgage reported $560 as its cost for "title examination," but a reasonable and customary fee for a title examination fee is in

48

the range of $125-$200.

101.

Defendant Washington Mutual has submitted similar false claims.  In the IRRRL loan referenced in Exhibit B, Defendant Washington Mutual did not properly report the actual amount paid for attorneys fees on the HUD form. Instead, Defendant Washington Mutual improperly bundled the attorneys fees into the "title search" fee.  Defendant Washington Mutual reported $745 as its cost for "title search," but a reasonable and customary fee for a title search is in the range of $125-$200.

102.

Defendant Mortgage Investors has committed similar fraud.  In the IRRRL loan referenced in Exhibit B, Defendant Mortgage Investors did not properly report the actual amount of the closing costs it incurred on the HUD form.  Instead, Defendant Mortgage Investors improperly bundled unallowable closing costs into the "title examination" fee.  Defendant Mortgage Investors reported $450 as its cost for "title examination," but a reasonable and customary fee for a title examination fee is in the range of $125-$200.

103.

Defendant National City has submitted similar false claims.  In the IRRRL

49

loan referenced in Exhibit B, Defendant National City did not properly report the actual amount paid for attorneys fees on the HUD form. Instead, Defendant National City improperly bundled the attorneys fees into the "title examination" fee. Defendant National City reported $550 as its cost for "title examination," but a reasonable and customary fee for a title examination fee is in the range of $125-$200.

104.

Defendant First Horizon has submitted similar false claims. In the IRRRL loan referenced in Exhibit B, Defendant First Horizon did not properly report the actual amount paid for attorneys fees on the HUD form. Instead, Defendant First Horizon improperly bundled the attorneys fees into the "title examination" fee. Defendant First Horizon reported $640 as its cost for "title examination," but a reasonable and customary fee for a title examination fee is in the range of $125-$200.

105.

Defendant Irwin Mortgage has submitted similar false claims. In the IRRRL loan referenced in Exhibit B, Defendant Irwin Mortgage improperly charged unallowable attorneys fees of $693.

50

106.

Defendant SunTrust Mortgage has submitted similar false claims. In the IRRRL loan referenced in Exhibit B, Defendant SunTrust Mortgage did not properly report the actual amount paid for attorneys fees on the HUD form. Instead, Defendant SunTrust Mortgage improperly bundled the attorneys fees into the "title examination" fee. Defendant SunTrust Mortgage reported $650 as its cost for "title examination," but a reasonable and customary fee for a title examination is in the range of $125-$200.

107.

Defendant Citimortgage has submitted similar false claims. In the IRRRL loan referenced in Exhibit B, Defendant Citimortgage did not properly report the actual amount paid for attorneys fees on the HUD form. Instead, Defendant Citimortgage improperly bundled the attorneys fees into the "title search" fee. Defendant Citimortgage reported $720 as its cost for "title search," but a reasonable and customary fee for a title search is in the range of $125-$200.

108.

For each and every IRRRL loan referenced on Exhibit B and for all other IRRRL loans where Defendant lenders charged illegal attorneys or other unallowable fees, Defendant lenders failed to meet their obligation to provide

51

accurate and truthful reporting prior to closing of the loan as required by VA Forms 26-8736 and 26-8736a.

109.

For each and every IRRRL loan referenced on Exhibit B and for all other IRRRL loans where Defendant lenders charged illegal attorneys or other unallowable fees, Defendant lenders provided false and misleading information and fraudulent certifications on VA Form 26-8923, the HUD form and VA Form 26-1820.

110.

For each and every IRRRL loan referenced on Exhibit B and for all other IRRRL loans where Defendant lenders charged illegal attorneys or other unallowable fees, Defendant lenders provided false and misleading information on VA Form 26-6850 and VA Form 26-1874. In many of those instances, false information was also provided on VA Form 26-6850a when foreclosures were involved.

111.

Each and every IRRRL loan referenced on Exhibit B went into foreclosure and the Defendant lender submitted a false claim to the VA for payment. For other IRRRL loans like those on Exhibit B which went into foreclosure, Defendant

lenders also submitted false claims to the VA for payment. Other loans made by Defendant lenders went into default and Defendant lenders made false statements or claims regarding those loans as well. The Government was forced to spend funds on all such loans because of the Government's obligations created by the fraudulently obtained guarantees.

112.

Defendant lenders made the referenced false certifications to the VA knowingly and repeatedly over a course of years. Defendant lenders intentionally concealed unallowable charges on IRRRL loans from veterans and from the VA.

113.

The lenders never notified the Government that their certifications – made *before, during and after* the IRRRL loan closing – were false and inaccurate.

114.

The Government relied upon each of the false certifications and representations made by Defendant lenders, to the detriment of both veterans and taxpayers. Because these loans are "non-supervised" by the VA, the certifications are the VA's "policing" tool to make sure the lenders follow and adhere to all applicable federal regulations and VA guidelines. The betrayal of the VA's trust in the lenders resulted in massive damage to the United States taxpayers over the last

53

decade, as well as the theft of tens of millions of dollars directly from our country's veterans.

## MOTIVE FOR THE FRAUDULENT ACTIONS OF DEFENDANT LENDERS

115.

The lenders' motive is crystal clear. The lenders engaged in the fraudulent schemes outlined herein in order to illegally raise their profits by benefitting from the financial assistance and guarantees provided by the Government. The Defendant lenders' fraud enabled them to obtain VA guarantees, which greatly reduced their risk in making IRRRL loans. But Defendant lenders also profited very directly from their fraudulent conduct because they illegally passed on to the veteran and the Government fees that were not supposed to be paid from loan proceeds – such as attorneys fees. Those unallowable fees were added to the loan amount that is guaranteed by the VA. That allowed the lenders to make an additional $400 to $1,000 on every IRRRL closing that involved inflated and unallowable fees. Since 2001, over one million IRRRL loans have been closed. The cost savings to lenders has been immense. Both the veteran borrowers and the taxpayers have been victimized by the lenders' fraud.

116.

There is also one additional important fact to consider. Many of Defendant

54

lenders sell these IRRRL loans to other entities.  By fraudulently obtaining

Government guarantees on the IRRRL loans, Defendant lenders are able to obtain

a premium price for the sale of the IRRRL loan to an acquiring entity.  Without the

Government guaranty in place, the amounts received upon the sale of the IRRRL

loan would be much lower.  With an IRRRL guaranty, the Government is obligated

to pay at least 25% of all losses on loans up to $417,000.  The Government pays

100% of all losses incurred up to 25% of the loan balance.  The loss protection

provided to the loan holder from the Government guaranty is a valuable asset.

## VIOLATION OF CIVIL FALSE CLAIMS ACT, 31 USC §§ 3729-33 *ET SEQ.*

117.

Paragraphs 1 through 116 are incorporated as if fully set forth herein.

118.

Defendants knowingly or recklessly disregarded applicable laws,

regulations, and rules to present false and fraudulent claims to the Veterans

Administration in direct violation of, *inter alia* 31 U.S.C. § 3729(a)(1)(A).

119.

Defendants made false statements to get false or fraudulent claims paid or

approved, in violation of *inter alia* 31 U.S.C. § 3729(a)(1)(B).

120.

More specifically, Defendants caused false certifications to be made and submitted to the VA. Truthful and accurate certifications are a condition precedent to both issuance of and payment under a guaranty of an IRRRL loan.

121.

Had the Government or the Veterans Administration known that the federal regulations and VA guidelines were violated or that Defendants' express certifications were false, the VA could not have guaranteed the VA loans. Federal regulations prohibit Defendants or other lenders from including unallowable and illegal fees in any IRRRL loan. The Government could not have issued a guaranty had it known the lender certifications were false.

122.

As a result of the Government's reliance upon the false and misleading statements and certifications by Defendants, the Government has been damaged and will continue to be damaged as tens of thousands of VA loans which contain unallowable fees go into default. Once these loans go into default, the Government's exposure as guarantor is triggered and the Government begins to spend taxpayer dollars in an attempt to delay or avoid foreclosures on the refinanced homes of veteran borrowers.

56

123.

The Government and the VA were not aware of the falsity of the claims and certifications made by Defendant lenders.  The Government and the VA, in reliance on the accuracy of the claims and/or statements, agreed to guarantee hundreds of thousands of VA IRRRL loans for the purposes of assuring payment to Defendants if and when default occurred.  Tens of thousands of these VA loans resulted in defaults, foreclosures or refundings (where the Government actually buys the loan in default prior to foreclosure), as well as other forms of post-default losses to the Government, which has caused great economic losses to taxpayers.

124.

In situations where the VA has information that a lender has acted intentionally or repeatedly in failing to adhere to the program guidelines, the VA can expel the lender from participation in the VA lending program.  2 C.F.R. §§ 180 and 801; *see also* VA Pamphlet 26-7, Ch. 17, 17-6 to 17-17.  If the VA had known that Defendants were repeatedly committing the fraud referenced herein, the lenders would surely have been removed from the VA Loan Guaranty Program. The taxpayers could have saved hundreds of millions of dollars from losses related to VA IRRRL loans if the lenders had been removed from the VA Loan Guaranty Program.

57

125.

The fraudulent acts of the lenders totally undermined one of the core purposes of the IRRRL loans which was to provide VA guarantees in exchange for the limiting of fees and charges paid by the veteran at the closing of an IRRRL loan.

126.

As a result of Defendants' actions set forth above, the United States has been severely damaged and will continue to incur damages in the future.

127.

Any guaranty which was issued based upon false certifications or with respect to which Defendant lenders failed to comply with federal regulations and VA guidelines is void.  Defendant lenders should be required to reimburse the Government for all costs the Government has incurred following default of any such loan.  These damages are trebled under the False Claims Act.

128.

The False Claims Act requires that each Defendant lender pay the Government a civil penalty of between $5,500 and $11,000 for each false claim. This means that a penalty should be imposed for each false claim submitted to the VA in which the lender falsely claimed it had complied with federal regulations

and VA guidelines.  A penalty should also be imposed for each HUD form where the Defendant lender has charged the veteran for unallowable fees.

**WHEREFORE**, Relators pray for judgment against Defendants as follows:

(a)    That Defendants be ordered to cease and desist from submitting and/or causing the submission of false claims, false certifications and illegal demands for payment in violation of 31 U.S.C. §§ 3729-33;

(b)    That Defendants be ordered to cease and desist from imposing unallowable charges upon veterans and from concealing such charges by falsely inflating allowable charges or otherwise violating 31 U.S.C. §§ 3729-33;

(c)    That judgment be entered in favor of the United States and Relators and against Defendants for all damages available pursuant to 31 U.S.C. §§ 3729-33, plus a civil penalty of not less than Five Thousand Five Hundred and No/100 ($5,500.00) Dollars, and no more than Eleven Thousand and No/100 ($11,000.00) Dollars per false claim, as provided by 31 U.S.C. § 3729(a);

(d)    That Relators be awarded the maximum amount permissible according to 31 U.S.C. § 3730(d);

(e)    That judgment be granted for the United States of America and Relators and against Defendants for any and all costs including, but not limited to,

court costs, expert fees, and all Relators' attorneys fees incurred to prosecute this action; and

(f)     That the United States and Relators be granted such other and further relief as the Court deems to be equitable and just.

Respectfully submitted this 23rd day of June, 2011.

BUTLER, WOOTEN &
FRYHOFER, LLP

BY: *James E. Butler Jr.*

JAMES E. BUTLER, JR.
 jim@butlerwooten.com
 Georgia Bar No. 099625
LEIGH MARTIN MAY
 leigh@butlerwooten.com
 Georgia Bar No. 473389
BRANDON L. PEAK
 brandon@butlerwooten.com
 Georgia Bar No. 141605
SAMANTHA A. DiPOLITO
 samantha@butlerwooten.com
 Georgia Bar No. 203011
2719 Buford Highway
Atlanta, Georgia  30324
(404) 321-1700
(404) 32101713 Fax

WILBANKS & BRIDGES, LLP

BY: *Marlan B Wilbanks*

MARLAN B. WILBANKS *by express permission JEB*
 mbw@wilbanks-bridgeslaw.com
 Georgia Bar No. 758223
TY M. BRIDGES
 tmb@wilbanks-bridgeslaw.com
 Georgia Bar No. 081500
3414 Peachtree Street, N.E., Ste. 1075
Atlanta, Georgia 30326
(404) 842-1075
(404) 842-0559 Fax

PHILLIPS & COHEN

BY: *Mary Louise Cohen*
MARY LOUISE COHEN *by express permission RRj*
    mlc@phillipsandcohen.com
    DC Bar No. 298299
TIMOTHY McCORMACK
    tmccormack@phillipsand cohen.com
    DC Bar No. 493692
2000 Massachusetts Avenue, N.W.
Washington, DC 20036
(202) 833-4567
(202) 833-1815 Fax


Attorneys for Relators/Plaintiffs