IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA ex rel. VICTOR E. BIBBY and BRIAN J. DONNELLY, | : : : : | |
| Relators/Plaintiffs, | : : | CIVIL ACTION NO. 1:06-CV-0547-AT |
| v. | : : | |
| WELLS FARGO BANK, N.A., individually and as s/b/m with WELLS FARGO HOME MORTGAGE, INC., et al., | : : : : | |
| | : | |
| Defendants. | : | |

## ORDER

Before the Court is Wells Fargo's Motion to Dismiss [Doc. 409]. Wells Fargo seeks to dismiss Relators from this case based on their violations of both the statutory seal requirement of 31 U.S.C. § 3730(b)(2), as well as the Court's seal orders. For the following reasons, Wells Fargo's motion is **DENIED**. However, as discussed below, the Court finds that significant monetary sanctions are warranted against Relators for violations of the Court's seal orders.

## I.    Background

Relators Victor E. Bibby and Brian J. Donnelly allege that certain lenders, including Wells Fargo, engaged in a fraudulent scheme to overcharge veterans on closing costs during the origination of loans under a United States Department of Veterans Affairs ("VA") loan refinancing program. Relators are licensed

mortgage brokers and were officers of U.S. Financial Services, Inc. d/b/a Veteran's Mortgage Company ("USFS").   Relator Brian Donnelly is himself a veteran of the armed services.  USFS specialized in the brokering and origination VA loans, including through the VA Interest Rate Reduction Refinancing Loan ("IRRRL") program.   Through USFS, Relators helped broker thousands of veterans' loans since 2001.  As brokers, Relators worked directly with veterans to take their applications, gather necessary documents, and connect veterans with a lender that actually originates the loan.  Relators acted as intermediaries between the lender and borrower.  Lenders must approve the loan application as well as ensure and guarantee compliance with VA regulations prior to the loan closing. Relators' allegations of mortgage fraud by lenders are based on their significant background with the process of brokering VA loans.

Relators filed their Complaint on March 8, 2006, complying with all *qui tam* filing requirements.  In particular, on March 8, Relators moved to seal the case, which the Court granted that same day.  Then, between 2006 and May 2009, the Government requested and obtained 11 extension of the seal, none of which the Relators opposed.   Shortly after the May 2009 grant of the Government's request for an extension, the two Relators began violating the Court's seal orders by privately communicating with the media.  They continued to violate the seal order for many months, during which time the case remained under seal or partial seal pursuant to 7 additional extensions.

The Government filed its eighteenth and final motion for an extension of the seal in September 2011, but this time, the Relators objected. The Court granted the Government's last request for an extension, over Relators' objection. On September 30, 2011, the Government elected not to intervene. Thus, on October 3, 2011, the Court ordered that the Complaint and its amendments, the First Amended Complaint and Second Amended Complaint, be unsealed.

Relators have independently litigated the case from that point on. To date, they have succeeded in obtaining settlements against six defendant lenders (other than Wells Fargo, which was a major player engaging in these VA loans, closing a substantial proportion of them), recovering over $161,000,000 on behalf of the Government. The False Claims Act ("FCA") provides that where the Government declines to intervene in a case, successful relators are entitled to between 25 and 30 percent of the recovered proceeds. 31 U.S.C. § 3730(d)(2). Accordingly, Relators have so far received $43,161,500 for their efforts in this case, out of which they have paid attorney's fees, taxes, expenses, etc. This $43,161,500 amounts to almost 27% of the total recovery.

On March 25, 2014, counsel for Relators first informed the Court that Relators had repeatedly disclosed the existence of this case to third parties beginning in mid-2009. These disclosures came to the attention of Relators' counsel while responding to Wells Fargo's subpoena of USFS for the production of documents. Relators have represented that neither their current counsel, nor

their original *qui tam* counsel, were aware of these disclosures.  Defendant to date has not challenged counsel's representation.

Wells Fargo swiftly moved to dismiss Relators on April 4, 2014.  The parties, including the Government, briefed the issues presented by Wells Fargo. On May 12, 2014, the Court notified the parties that it would hold a hearing to address Relators' seal violations and consider in particular, "[w]hat sanctions other than dismissal should be considered by the Court as it reviews whether some form of sanction may be warranted based either on the provisions of the False Claims Act or based on the Court's exercise of its inherent power to sanction?" (May 12, 2014 Ord., Doc. 419.)  The Court then held an evidentiary hearing on this matter on June 11, 2014 and subsequently received supplemental briefing from Relators on the issue of monetary sanctions.  (*See* Doc. 441-1.)

### A.    Nature of Seal Violations

In or about July 2009, while this action remained under seal pursuant to a Court order, Relators contacted local and national news media about this case via email.  Relators did not receive a substantive response from most of the news organizations they contacted.  However, Relators were successful in building a relationship with two individuals at Fox-5, an Atlanta Fox television affiliate. Relators regularly communicated with Dale Russell, a Fox-5 reporter, and Mindy Larcom, a Fox-5 producer, from mid-2009 until the unsealing of this case in October 2011.  According to the Relators, these two journalists agreed to maintain complete confidentiality of the information they were provided regarding this *qui*

4

*tam* case until the seal was lifted.   None of the parties contend that there is evidence that Fox-5 or any other reporters or media outlets disclosed information provided by relators before the formal lifting of the seal in this case in October 2011.

The earliest written communication available between Relators and the two Fox-5 journalists is an email dated July 27, 2009 from Mr. Russell to Relator Bibby.   In it, Mr. Russell states that he is "following up" with Relator Bibby, suggesting that Relators had made prior contact with the journalists.[1]   Relators maintained an ongoing dialogue with Mr. Russell and Ms. Larcom from that point until the unsealing of this case.   During this time, Relators discussed this and similar cases (not under seal) with Mr. Russell and Ms. Larcom.   After this suit was initially filed in 2006, third-party veterans filed unsealed cases, including at least one class action, which involved similar claims against Wells Fargo.[2]   These other cases attracted media attention, and at points Relators provided Mr. Russell and Ms. Larcom with updates and background on those cases and other mortgage related litigation.   Relators frequently also provided Mr. Russell and Ms. Larcom with general, non-confidential information about the VA's mortgage program.

---

[1] The precise date in 2009 when Relators first made contact with Fox-5 is unclear. Relator Donnelly testified that he and Bibby first contacted Fox News several months before July 2009. (June 11, 2014 Hr'g Tr., Doc. 445 at 91.)

[2] *See, e.g., Gaston v. Wells Fargo Home Mortg.*, Civ. A. No. 08CV12515E (Clayton Cnty., Ga., State Ct. Dec. 17, 2008); *Wynn v. Wells Fargo Bank, N.A.*, Civ. A. No. 1:09-CV-00165-TWT, Doc. 1 (N.D. Ga. Jan. 20, 2009).

The Court has reviewed roughly 175 pages of emails and their attachments between Relators, Mr. Russell, and Ms. Larcom.  (June 11, 2014 Hrg. Ex. 13.)  The content of these emails and their attachments ranges from the exchange of jokes, conversational quips, and copies of news articles to detailed discussions of the progress of this lawsuit and status of the Government's involvement in this *qui tam* action.  To be clear, some of the messages between Relators and the two Fox-5 journalists, along with their lengthy attachments, relate to other publicly disclosed cases and news developments or were otherwise harmless.  Nevertheless, other emails show that Relators were deliberately sharing information about this suit with Mr. Russell and Ms. Larcom while the case remained under seal.

Beyond disclosing the existence of the case, Relators kept Mr. Russell and Ms. Larcom appraised of developments that were relevant to this *qui tam* suit.  For instance, Relators stated in an email that they had recently received an update from their attorney about the litigation and offered to discuss the details over the phone.   Relators repeated this practice on multiple occasions with Russell and Larcom.  In another email, Relators forwarded an email sent by their attorney that conveys their attorney's thoughts about the importance of an attached article.  Along similar lines, Relators frequently emailed their counsel to advise them of relevant news stories or VA policy updates while blind copying the same email to Mr. Russell or Ms. Larcom.

6

Relators also provided details about the investigation of this case by virtue of sharing documents and memoranda prepared by Relators' counsel for transmission to the Government.   Relators disclosed these documents and discussed meetings between Relators' counsel and the Government.   In one disclosed memo, addressed to the U.S. Attorney, Relators' counsel described the details of the alleged fraud Relators claimed was being perpetrated against veterans, including citations to statutes, regulations, and other applicable law.   In another disclosure, Relators' counsel described her personal impression of a meeting with the Government; the same email included a detailed memo with case analysis from Relators' counsel that was provided to the Government for that meeting.   In the course of these and other disclosures, Relators revealed the names of Government attorneys and investigators who were involved in the case.

Fox-5 appears to be the only media organization with which Relators discussed this case in detail.   However, the Court notes Relators' unsuccessful attempts to engage other news media.   In at least two outreach efforts, Relator Bibby created and used an anonymous email account to convey information about the sealed case.[3]   The most egregious email disclosed was one that Relator Bibby sent to MSNBC on February 5, 2010:

> To Whom It May Concern:
>
> We are federal whistleblowers in an ongoing federal investigation on banks that have defrauded the federal government and veterans on home refinancing loans through the VA home loan guarantee

---

[3] Relators testified that Relator Bibby sent messages using this anonymous email account. Relator Donnelly knew about this email account and agreed with Bibby's use of the account.

program.  This is a sealed case and therefore has not been publicly disclosed.  This investigation has been going on for over (4) years and still has no resolution to date.  The fraud spans the entire country and has affected over 750,000 VA loans over the past nine years.  This practice of fraud has been going on for well over 20 years.  The feds are in talks now with one of the many banks/mortgage companies that have been named by us in the case.  One of the odd turns in the case has been the reluctance of the Dept of VA to aggressively pursue recourse for the damage.  This could be due to either poor record keeping or as we suspect a good old fashion [*sic*] cover up.  We have documented proof and recordings that we have supplied the DOJ and would like to speak with you off the record about the case.  There is much more we can tell you about the case without blowing our anonymity such as the upcoming congressional hearings on the subject matter involved in this case.  If you have an interest in speaking with us off the record please email us back with a contact name and number and we will call to discuss in greater detail.

(Ex. 7, Doc. 409-1 at 49.)  MSNBC does not appear to have responded to this message.

Relators admit to violating the seal in this case, and that they knew these disclosures were impermissible.  At the evidentiary hearing on this matter, Relators testified that they did so to protect veterans.  Relator Bibby testified that he was instructed by the Government to continue brokering IRRRL loans for years after this *qui tam* suit was first filed, even though the alleged fraud had not been resolved.  (Doc. 445 at 82-84.)  Relator Donnelly, who is himself a veteran, testified that he was "fed up" with the alleged fraud that continued to be committed against veterans over four years after this case was filed.  (Doc. 445 at 102-103.)  Relators' emails to Mr. Russell and Ms. Larcom express their desire to publicize this case, as well as their frustration with the length of the seal.  Both

Relators represent that they violated the seal to minimize the harm inflicted on veterans.[4]

## B.    Impact of Seal Violations

Despite Relators' disclosures, there is no evidence that the existence or progress of this *qui tam* case was publicized while it remained under seal. Relators testified that they received assurances from Mr. Russell and Ms. Larcom that Fox-5 would keep this lawsuit confidential until it was unsealed.  These were oral assurances, and Relators admit they had no written agreement with Fox-5 to refrain from publishing information about this case while it remained under seal. Nevertheless, there is no indication that Fox-5 (or anyone else) published or otherwise disclosed the existence of this case until after the seal was lifted on October 3, 2011.   Thus, Relators' disclosures were effectively limited to Mr. Russell, Ms. Larcom, and Fox-5.[5]

Ultimately, Relators' seal violations were not publicized and did not place Wells Fargo or other Defendants on notice of this case before it was unsealed. Because of this, Wells Fargo and the Government admit that Relators' seal violations resulted in no actual harm to the Government's investigation of this

---

[4] According to Relator Bibby, USFS "for the most part went dormant in 2008," reducing substantially the number of loans it was closing.  (June 11, 2014 Hrg. Tr. at 84, Doc. 445.)  Thus, the number of loans Relators closed with USFS had decreased from "thousands" of loans prior to 2008 to "hundreds" of loans by 2009 and 2010.  (*Id.* at 84.)

[5] Relator Bibby also admitted to telling his wife and cousin about this *qui tam* suit.  The Court considers his spousal communications privileged and does not decide whether they constitute seal violations.  The Court has further reviewed Relator Bibby's correspondence with his cousin. The Court agrees with Relator Bibby's representation that he mainly discussed another class-action suit and only mentioned the existence of this case in passing.

case while the case was sealed.[6]  They also admit that none of the Defendants learned of the filing of this *qui tam* action prematurely, prior to their receipt of official government notice of the lawsuit.

### C.    Arguments of the Parties

Based on these seal violations, Wells Fargo seeks to dismiss Relators from this case.  Wells Fargo argues that this would not require that the entire case be dismissed, because the Government may choose to prosecute the case from this point forward.  Wells Fargo believes the severity and bad faith underlying Relators' disclosures warrant dismissal of this action.[7]

After the parties had submitted their briefs relating to Wells Fargo's motion to dismiss, the Court sought the position of the Government, as the party ostensibly harmed by Relators' seal violations.  Accordingly, the Government filed a response to Wells Fargo's motion to dismiss.  (Doc. 428.)   The Government contends that while Relators' misconduct was serious, dismissal would be inappropriate because: (1) there is no evidence that the Government's investigation in this case was actually harmed, and (2) dismissal of Relators would grant an unnecessary windfall to Wells Fargo.  (*See also* June 11, 2014 Hrg. Tr. at 156, Doc. 445 ("Wells Fargo would be the beneficiary of the Relators'

---

[6] Despite conceding this point, Wells Fargo argued at the hearing that providing the Fox-5 journalists with information about the Government's investigation of this case was in and of itself harmful.  (Doc. 445 at 124-25.)

[7] In its motion to dismiss, Wells Fargo suggests that Relators committed discovery abuses by failing to disclose these seal violations in response to prior discovery requests.  As expressed at the hearing, the Court considers this a separate issue that is not yet ripe for review.  The Court notes that Wells Fargo has not asserted that Relators' counsel bore any culpability in connection with Relators' improper communications or belated disclosure of such to Defendants.

dismissal and the American taxpayers would be the ones who are punished.").) Still, the Government has concerns about Relators' actions and their implications for other *qui tam* cases.   As an alternative to dismissal, the Government recommends that the Court impose a sanction in the approximate range of $2.7 million.

For their part, Relators argue that their dismissal is not required by the statutory seal requirement or the case law interpreting that statute.   Relators suggest that if a monetary sanction is warranted, a sanction of $500,000 is appropriate.

## II.    Dismissal of Relators

Wells Fargo initially moved to dismiss Relators from this case based on their violations of the statutory seal requirement under 31 U.S.C. § 3730(b)(2). In its reply, Wells Fargo argued for the first time that the Court should also consider dismissal of Relators either pursuant to Rule 41(b) of the Federal Rules of Civil Procedure or through the exercise of its inherent authority.   (Reply, Doc. 414 at 4.)   Relators moved to strike these late-raised arguments.   Because the Court may *sua sponte* order dismissal under Rule 41(b) or its inherent authority, the Court denied the motion to strike and allowed Relators to file a surreply brief addressing these new arguments.   *See Fequiere v. Alabama State Univ.*, 558 F. App'x 881 (11th Cir. 2014) ("[A] district court may *sua sponte* dismiss a complaint under the authority of . . . Rule 41(b).").   The Court considers each purported basis for dismissal below.

## A.     Dismissal for Violation of 31 U.S.C. § 3730(b)(2)

Wells Fargo first argues that this action should be dismissed because Relators violated the statutory seal requirement set forth in 31 U.S.C. § 3730(b)(2). This code section authorizes a private individual, known as a *qui tam* relator, to file a complaint against a defendant on his own and the Government's behalf. The *qui tam* complaint must initially be filed under seal and kept under seal for at least sixty days, during which time the Government investigates and decides whether to intervene.[8]  31 U.S.C. § 3730(b)(2). The Government may also request more time, and the court is empowered to grant this request upon a showing of "good cause." *Id.* § 3730(b)(3). As noted above, Relators complied with all initial filing requirements and, for several years, faithfully complied with the Court's multiple orders extending the seal. But beginning in July 2009, Relators blatantly violated the Court's seal orders. Wells Fargo argues that the violation of these Court orders amounts to a violation of 31 U.S.C. § 3730(b)(2) and warrants dismissal.

The primary purpose of this seal requirement is to balance the *qui tam* relator's interest in initiating the lawsuit with the Government's interest in

---

[8] In full, 31 U.S.C. § 3730(b)(2) reads as follows:

> A copy of the complaint and written disclosure of substantially all material evidence and information the person possesses shall be served on the Government pursuant to Rule 4(d)(4) of the Federal Rules of Civil Procedure. The complaint shall be filed in camera, shall remain under seal for at least 60 days, and shall not be served on the defendant until the court so orders. The Government may elect to intervene and proceed with the action within 60 days after it receives both the complaint and the material evidence and information.

investigating the relator's claim and intervening or alternatively pursuing a possible criminal case.

> The seal provision provides an appropriate balance between these two purposes by allowing the *qui tam* relator to start the judicial wheels in motion and protect his litigative rights, while allowing the government the opportunity to study and evaluate the relator's information for possible intervention in the *qui tam* action or in relation to an overlapping criminal investigation.

*United States ex rel. Lujan v. Hughes Aircraft Co.*, 67 F.3d 242, 247 (9th Cir. 1995) (citing S.Rep. No. 345, 99th Cong., 2d Sess. 24, *reprinted in* 1986 U.S.C.C.A.N. 5266, 5289).[9]  The Second Circuit in *United States ex rel. Pilon v. Martin Marietta Corp.* explained that the seal addressed the concern "that *qui tam* claims might overlap with or tip a defendant off to pending criminal investigations."  60 F.3d 995, 998 (2d Cir. 1995).  The sealing requirement, however, was part of a larger 1986 amendment to the FCA whose explicit goal was to motivate private litigants to take on *qui tam* actions.

 The statute does not provide an explicit sanction for violating the § 3730(b)(2)'s seal requirements.  Although the Eleventh Circuit has held in an unpublished opinion that a complete abandonment of all *qui tam* filing procedures *might* warrant dismissal, *Foster v. Savannah Commc'n*, 140 F. App'x

---

[9] A secondary purpose of this seal requirement is to prevent the possibility that defendants may be required to answer a complaint without first knowing who will be bringing the suit.  *See Lujan*, 67 F.3d at 247; *United States ex rel. Pilon v. Martin Marietta Corp.*, 60 F.3d 995, 999 (2d Cir. 1995); *United States ex rel. Milam v. Regents of Univ. of Cal.*, 912 F. Supp 868, 890 (D. Md. 1995).

905 (11th Cir. 2005),[10] the Eleventh Circuit has not addressed when dismissal would be an appropriate sanction for violating the Court's subsequent order extending the seal.

A majority of courts to address the appropriate remedy for a seal violation in a *qui tam* case consider the objectives of the sealing requirement — and particularly the government's interest in investigating the allegations — and assess whether the particular seal violation hampered these objectives. *See, e.g.*, *Lujan*, 67 F.3d at 245; *Pilon*, 60 F.3d at 999; *Nasuti v. Savage Farms, Inc.*, No. 12-30121-GAO, 2014 WL 1327015, at *15 (D. Mass. Mar. 7, 2014) (Nieman, Mag. J.) (rejecting defendants' argument that a *qui tam* complaint should be dismissed due to a seal violation because the record contained no evidence of harm to the government, the violation was relatively minor, and the relator had not likely acted in bad faith); *United States ex rel. Rigsby v. State Farm Fire and Cas. Co.*, No. 1:06CV433, 2011 WL 8107251, at *10–11 (S.D. Miss. Jan. 24, 2011) (concluding that the impact of the seal violation was not severe enough to warrant dismissal); *United States ex rel. Kusner v. Osteopathic Med. Ctr. of Philadephia*, No. CIV. A. 88–9753, 1996 WL 287259, at *5 (E.D. Pa. May 30, 1996) (noting that the FCA does not require dismissal of a *qui tam* action for violating its confidentiality provisions and holding that because the government had already chosen not intervene when the violations occurred, dismissal was not

---

[10] *Foster* involved a *pro se* litigant who "did not comply with *any* of the statutory requirements before filing" her complaint on the public record of the Court in her own name. *Foster*, 140 F. App'x at 908 (emphasis added).

warranted); *see also United States ex rel. Surdovel v. Digirad Imaging Solutions*, No. 07-0458, 2013 WL 6178987, at *4 (E.D. Pa. Nov. 25, 2013) (granting the government's motion to dismiss a *qui tam* action because of the "relator's counsel's egregious procedural errors [which] completely frustrated the government's ability to investigate"); *United States ex rel. Stewart v. Altech Servs.*, No. CV-07-0213-LRS, 2010 WL 4806829, at *2 (E.D. Wash. Nov. 18, 2010) (holding that the public filing of an amended complaint after the unsealing of an original *qui tam* complaint did not warrant dismissal and that failure to comply with the seal provisions of the statute is not a jurisdictional condition requiring dismissal); *United States ex rel. Milam v. Regents of Univ. of Cal.*, 912 F. Supp 868, 890 (D. Md. 1995) (reasoning that dismissal of an action for failing to follow § 3730's procedural requirements when filing an amended *qui tam* complaint is not required by the terms of this provision and does not further the goals of this provision and thus denying the defendant's motion for summary judgment on this ground).   Courts also consider whether the relator or his counsel acted in bad faith. *See, e.g.*, *Lujan*, 67 F.3d at 245; *Nasuti*, 2014 WL 1327015, at *15 (considering that the relator did not likely act in bad faith in deciding not to dismiss an action because of a seal violation).

In *Lujan*, the relator violated the seal by impermissibly communicating with the *Los Angeles Times* regarding her *qui tam* action at some point during the first 60 days of the seal.  The trial court, on the defendant's motion, dismissed the action but failed to identify the legal authority for this dismissal.  The Ninth

Circuit reversed and remanded.  The court explained that the requirements of § 3730(b)(2) were not jurisdictional, and thus a "violation of those requirements does not *per se* require dismissal of the *qui tam* complaint."  *Lujan*, 67 F.3d at 245.  Instead, the Ninth Circuit held that courts must consider the statutory goals of the seal requirement and decide whether dismissal furthers these goals.

In particular, the court instructed lower courts to consider: (1) the harm to the government; (2) the nature and severity of the seal violation; and (3) the bad faith or willfulness of the relator in violating the seal.  *Id.* at 245–46.  The court doubted that the Government was harmed at all, reasoning that the disclosures to the newspapers were "only general descriptions of [the relator's] claims" unlikely to tip the defendant off in any meaningful way.  *Id.* at 246.  The court also contrasted the relator's seal violation with those that more likely warranted dismissal — like where the relator "*completely* failed to comply with *any* of the requirements of § 3730(b)(2)."  *Id.* at 246; *see Foster*, 140 F. App'x at 908.  And the record on appeal revealed no evidence that relator acted in bad faith.  In any case, because it was for the district court to decide these factual issues in the first instance, the court remanded for further proceedings.  "Our holding today," the court explained, "will require district courts to explore the facts underlying violations of the seal requirements before concluding that the extreme sanction of dismissal is warranted."  *Id.* at 247.[11]

---

[11] On remand, the district court dismissed the action for a reason other than the seal violation, and thus did not have an opportunity to weigh the factors as laid out in *Lujan*.  *See United*

Similarly, in *Pilon*, the Second Circuit considered the objectives underlying the seal requirements and held that the relators' disregard for these requirements "incurably frustrated these interests" thus warranting dismissal of their action with prejudice.  *Pilon*, 60 F.3d at 999.  James Pilon was the defendant's former employee.  He allegedly discovered that the defendant submitted false claims to the United States government.  His wife independently learned of additional false claims, and together the two reported this wrongdoing to the government.  According to the Pilons, they then cooperated with the government for over two years while the government investigated the allegations.  At some point, and for reasons unexplained in the Second Circuit opinion, the government severed ties with the Pilons, prompting the Pilons, through counsel, to file a *qui tam* action in federal court.  The Pilons did not indicate to the Clerk's Office that their complaint should be filed under seal and did not file a motion or notice in an attempt to seal the complaint.  Although their counsel had some conversation about sealing with the clerk, counsel was aware that the clerk was confused about the sealing requirement.  Nonetheless, the Pilons' counsel "did nothing further to assure that the complaint was properly filed."  *Id.* at 997.  Moreover, the Pilons failed to serve the government as required.  Worse still, several hours after filing the complaint, the Pilons' counsel arranged an interview between a local reporter and the relators, which resulted in a published article relating the substance of

---

*States ex rel. Lujan v. Hughes Aircraft Co.*, No. CIV-92-1282 SVW, 2000 WL 33775399, at *5-6 (C.D. Cal. Jan. 20, 2000).

the complaint.  And finally, the day after the published article, the defendant received a faxed copy of the *qui tam* complaint.

The trial court dismissed the Pilons' action without prejudice.  On appeal, the Second Circuit held that the dismissal should have been with prejudice because the Pilons' "failure to comply [with the seal requirements] was particularly egregious and incurably frustrated the statutory objectives underlying the filing and service requirements."  *Id.* at 998.  Like the Ninth Circuit in *Lujan*, the court considered whether the government was harmed by the statutory violation.  But unlike in *Lujan*, there was no question that the Government was deprived of its opportunity to decide whether the *qui tam* complaint would interfere with an ongoing investigation.  And the defendant in *Pilon* was made aware of the specific *qui tam* allegations.  Finally, the court recognized the relators' counsel's "considerable lack of good faith" and held that the appropriate sanction for the incurable seal violation was dismissal with prejudice.  *Id.* at 999.

Only one Circuit has determined that a violation of the *qui tam* procedural filing requirements mandates dismissal regardless of the facts and circumstances. *United States ex rel. Summers v. LHC Grp., Inc.*, 623 F.3d 287, 296 (6th Cir. 2010), *cert. denied*, 131 S. Ct. 3057 (2011).  In *Summers*, much like in *Pilon*, the relator initially filed the complaint without an accompanying motion to file under seal.  Several days later, a clerk contacted counsel for the relator, notifying him that the complaint would not be filed on the Electronic Case Filing ("ECF")

system until they had discussed the proper filing method.  Counsel was initially told an email request to seal the complaint would suffice, but later that day was instructed to file a motion.  The next day, before counsel filed the necessary motion, the complaint was posted on the publicly-accessible docket (the PACER system).  Counsel filed a belated motion to seal a few days after that, which the court denied because counsel failed to set forth a basis for sealing.  Several weeks later, the defendant moved to dismiss for lack of subject matter jurisdiction because of the relator's disregard of the *qui tam* filing requirements.  Before the district court ruled on that motion, the relator publicly filed a motion to amend the complaint, and separately docketed a publicly available proposed amended complaint.  Without waiting for the court to rule on her motion to amend, the relator filed another publicly-available version of her complaint.

The district court granted the defendant's motion to dismiss and the Sixth Circuit affirmed.  The Sixth Circuit expressly rejected a case-by-case analysis, as provided for in *Lujan* and applied in *Pilon*.[12]  Instead, the court reasoned that the statutory procedures for filing a *qui tam* action were the product of Congressional deliberation.   "In fashioning the FCA's procedural requirements," the court explained, "Congress clearly identified the factors it found relevant and considered the tension between them, and decided that a sixty-day *in camera* period was the correct length of time required to balance those factors."  *Id.* at

---

[12] Judge Keith clarified in his concurring opinion that, contrary to the defendant's and district court's characterization, the Ninth and Second Circuits both employed a case-by-case approach to determining whether dismissal is an appropriate sanction for a seal violation in a *qui tam* action.  *Summers*, 623 F.3d at 299-300 (Keith, J., concurring).

296.  For the district court to engage in its own balancing test, the court reasoned, would amount to "a form of judicial overreach."  *Id.* at 298.  Accordingly, the Sixth Circuit announced a *per se* rule mandating dismissal with prejudice when a *qui tam* relator breaches the filing seal.  Although the court was faced only with a breach of the initial filing requirements, the court found "illusory" the "distinction between *Lujan*'s after-filing violation and Summers's failure to file under seal at all."[13]   *Id.* at 294-95.  Thus, the court broadly announced that violating the *qui tam* statute's seal requirement in any manner at any time necessitates dismissal.  *But see United States ex rel. Gale v. Omincare, Inc.*, No. 1:10-cv-127, 2013 WL 3423276, at *11–13 (N.D. Ohio July 8, 2013) (noting that *Summers* "did not address what it means to break the seal of a *qui tam* action" and holding on the facts before it that the seal had not been breached because there was no evidence of a "public discussion of the filing of the complaint").  This Court has found only one other court outside of the Sixth Circuit to arguably adopt a *per se* rule of dismissal.  *See Erickson ex rel. United States v. Am. Institute of Biological Sciences*, 716 F. Supp. 908, 910 (E.D. Va. 1989).[14]

The Court is not persuaded by the Sixth Circuit's reasoning in *Summers* and instead adopts the approach deployed by the vast majority of courts, and in

---

[13] The Court notes, though, that *Lujan*'s "after-filing" violation still occurred within the initial 60-day statutory seal period.

[14] In *Erickson*, the district court held that the *qui tam* relators' failure to file the initial complaint *in camera* warranted case dismissal.  *Erickson*, 716 F. Supp. at 910.  Although some might construe this decision as imposing a *per se* rule of dismissal for a seal violation, the court drew a "sensible distinction between cases in which filing and service errors can be cured and those in which they cannot."  *Id.* at 912.  Because no cure existed for the relators in *Erickson*, the court held that dismissal was the proper remedy.  Accordingly, *Erickson* did not truly apply a *per se* rule of dismissal.

particular, the Ninth Circuit in *Lujan*.  A rule mandating dismissal for any seal violation would not, in every case, further the statutory purpose of the 1986 amendments, which added the seal requirement to the FCA.  Indeed, as the Sixth Circuit noted, the sealing requirement was added to the False Claims Act in 1986 as part of Congress's overall effort to reinvigorate the private bar to take on False Claims Act cases.  *See Summers*, 623 F.3d at 292 ("[The] overall intent in amending the *qui tam* section of the False Claims Act [was] to encourage more private enforcement suits." (quoting S. Rep. No. 99-345, at 23-24, 1986 U.S.C.C.A.N. 5266, 5288-89)).  The seal requirement must be read in that context.  In addition, Congress did not expressly provide that the seal requirements were jurisdictional.  *See also Lujan*, 67 F.3d at 245 ("The requirements of § 3730(b)(2) are not jurisdictional . . . .").  Nor has the Eleventh Circuit indicated that it would read into the statute this jurisdictional requirement.[15]  Thus, this Court declines to accept Wells Fargo's invitation to do so.

Moreover, the court in *Summers* did not contemplate the type of seal violation here — one occurring years *after* the mandatory minimum sixty-day

---

[15] Courts generally eschew jurisdictional analysis unless the statute expressly demands it.  *See, e.g.*, *Henderson ex rel. Henderson v. Shinseki*, 131 S.Ct. 1197, 1203 (2011) (holding that the 120-day deadline for seeking Veterans Court review was not jurisdictional because there was no clear indication that Congress wanted this requirement to be jurisdictional); *Arbaugh v. Y&H Corp.*, 546 U.S. 500 (2006) (holding that the numerical qualification contained in Title VII's definition of employer is an element of a Title VII claim, and not a jurisdictional prerequisite);  *In re Trusted Net Media Holdings, LLC*, 550 F.3d 1035, 1042 (11th Cir. 2008) (holding in a bankruptcy case that because 11 U.S.C. § 303 "does not evince a congressional intent to implicate the bankruptcy courts' subject matter jurisdiction," the statutory requirements that must be included in a bankruptcy petition are not jurisdictional).

seal period.  *See Summers*, 623 F.3d at 297.  *Summers*'s reasoning centers on the court's conclusion that Congress has already weighed the interests it found relevant and concluded that a *qui tam* complaint that is sealed for sixty days balances these interests.  *Id.*  (". . . Congress's selection of sixty days was intended to represent its own judgment as to how to balance those interests.")  Thus, according to the court in *Summers*, employing a *Lujan*-style balancing test "would, in our opinion, represent a form of judicial overreach."  *Id.* at 296.  But as the court in *Summers* recognized, Congress has expressly granted the courts the discretion to decide when a complaint should be sealed for more than sixty days. *Id.* (citing 31 U.S.C. § 3730(b)(3)).  This same reasoning would in turn vest a court with the discretion to impose an appropriate sanction for a breach of its own order extending the seal.  Put another way, it is not clear in this case that the Relators violated the statute, but instead, violated the Court's orders extending the original seal.  Therefore, even if *Summers* were controlling law in this circuit, the unique facts of this case fall well outside of its holding.

For these reasons, the Court declines to adopt a *per se* rule of dismissal for violating the seal.  The Court will instead, in Part III below, consider the relevant facts in fashioning an appropriate monetary sanction.  The Court now turns to Wells Fargo's alternative arguments for dismissal.

### B.    Dismissal Under Rule 41(b)

Wells Fargo alternatively seeks dismissal of Relators with prejudice under Rule 41(b) of the Federal Rules of Civil Procedure.  Pursuant to Rule 41(b), the

Court has discretion to dismiss an "action or any claim" against a defendant, if it finds that "the plaintiff fails to prosecute or to comply with . . . a court order." Fed. R. Civ. P. 41(b); *Fequiere*, 558 F. App'x 881.  Relators' actions constitute violations of the Court's seal order and its extensions in this case.  However, "[d]ismissal of a case with prejudice is considered a sanction of last resort, applicable only in extreme circumstances." *Zocaras v. Castro*, 465 F.3d 479, 483 (11th Cir. 2006) (quotation omitted).  Under Rule 41(b), dismissal with prejudice is only appropriate if the court finds that there is both "a clear record of delay or willful conduct *and* that lesser sanctions are inadequate to correct such conduct." *Id.* (citing *Betty K Agencies, Ltd. v. M/V Monada*, 432 F.3d 1338 (11th Cir. 2005)) (emphasis added).

Wells Fargo argues that dismissal is warranted here because Relators' violations were deliberate and protracted, and because "there is a need to deter others from committing similar violations."   (Doc. 414 at 5.)   The Court recognizes the severity of Relators' conduct.  However, Wells Fargo neglects to consider the imposition of other, less extreme sanctions.  Instead, Wells Fargo relies on *Zocaras* for the principle that dismissal is warranted because Relators have "so violate[d] the judicial process that imposition of a harsh penalty is appropriate not only to reprimand the offender, but also to deter future parties from trampling upon the integrity of the court." *Zocaras*, 465 F.3d at 484 (quoting *Dotson v. Bravo*, 321 F.3d 663, 668 (7th Cir. 2003)).

The Court finds that the "ultimate sanction" of dismissal under Rule 41(b) is not the appropriate sanction to impose and that monetary sanctions are sufficient to vindicate the authority and integrity of the judicial process here. *Zocaras*, 465 F.3d at 484.

## C.     Dismissal Based on the Court's Inherent Authority

Wells Fargo finally argues that the Court should invoke its inherent authority to sanction the Relators and dismiss this action due to the Relators' "protracted willful misconduct." (Doc. 414 at 4.)   Federal courts possess the inherent power to sanction bad faith litigation misconduct. *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991).   While dismissal falls within the Court's inherent power, this power must be exercised with discretion and restraint. *Id.* at 44-45.   "A primary aspect of that discretion is the ability to fashion an appropriate sanction for conduct which abuses the judicial process." *Id.*

 "[W]hen there is bad-faith conduct in the course of litigation that could be adequately sanctioned under the Rules, the court ordinarily should rely on the Rules rather than the inherent power." *Id.*  Having concluded that dismissal is inappropriate under the FCA and Rule 41(b), the Court declines to dismiss Relators through an exercise of its inherent authority.  However, the Court will rely on its inherent authority to impose significant monetary sanctions, as discussed further below.

### D.    Conclusion

For the foregoing reasons, Wells Fargo's Motion to Dismiss [Doc. 409] is **DENIED**.

## III.   Monetary Sanctions Against Relators

As an alternative to dismissal, the Government proposes the imposition of serious monetary sanctions against Relators.   The Government frames its proposal in the context of the proceeds already awarded to Relators resulting from prior settlements with six other defendant lenders in this case, approved by the Government and the Court.  The FCA provides that Relators were entitled to a "reasonable" award that is between 25 and 30 percent of the proceeds recovered. § 3730(d)(2).  In each of the six settlements here, the Government agreed to an award where Relators would receive between 26 and 27 percent of the recovered amount, which, according to the Government, has resulted in an award of $43,161,500 shared by Relators.   (Doc. 428 at 15.)   Thus, Relators have consistently received awards in excess of the statutory minimum.

In light of Relators' misconduct, the Government argues that any award to Relators in excess of the 25 percent statutory minimum was not reasonable.  The difference between Relators' actual award and the statutory minimum is shown here:

| Proceeds of Settlements | Percent Paid to Relators | Actual Award to Relators | 25% Minimum Share | Award in Excess of Minimum |
|---|---|---|---|---|
| $45,000,000 | 26 | $11,700,000 | $11,250,000 | $450,000 |
| $38,000,000 | 26.875 | $10,212,500 | $9,500,000 | $712,500 |
| $45,000,000 | 27 | $12,150,000 | $11,250,000 | $900,000 |
| $16,000,000 | 27 | $4,320,000 | $4,000,000 | $320,000 |
| $7,500,000 | 27 | $2,025,000 | $1,875,000 | $150,000 |
| $10,200,000 | 27 | $2,754,000 | $2,550,000 | $204,000 |
| | | | | |
| | Total: | $43,161,500 | $40,425,000 | $2,736,500 |

The Government argues that neither it nor the Court would have authorized an award for Relators in excess of 25 percent had either known of Relators' seal violations. The Government's proposal is to sanction Relators for the amount they have been awarded in excess of the statutory minimum. (Doc. 428 at 15.) This represents a $2,736,500 monetary sanction against Relators, which would be paid to the United States. The Government acknowledges that an appropriate sanction may also be greater or lesser than this amount.

Relators oppose this sanction, arguing instead that a $500,000 sanction would be more appropriate. (Doc. 431 at 7.) Relators argue that the Government's proposal conflicts with the aims of the FCA, and ignores the substantial effort and energy that Relators have expended in litigating this case on behalf of the public. Furthermore, Relators contend that the Government's proposed sanction does not account for taxes or attorney's fees already paid by Relators on the settlement amounts recovered. Relators point out that any sanction would be paid with funds that were already taxed and subject to attorney's fees. After considering taxes and fees, Relators argue that the real amount of a $2,736,500 sanction is roughly $6,071,000. (*Id.* at 2.)

### A.  Inherent Authority to Impose Monetary Sanctions

The Court looks to established judicial principles for determining a sanction for violation of the Court's orders in order to shape a sanction tailored to the specific circumstances of this case.  As discussed above, neither the False Claims Act nor the Federal Rules of Civil Procedure expressly authorize monetary sanctions for Relators' seal violations.   However, "when rules alone do not provide courts with sufficient authority to protect their integrity and prevent abuses of the judicial process, the inherent power fills the gap."  *Peer v. Lewis*, 606 F.3d 1306, 1314 (11th Cir. 2010) (quoting *Shepherd v. Am. Broadcasting Cos.*, 62 F.3d 1469, 1474 (D.C. Cir. 1995)).  "The inherent power is both broader and narrower than other means of imposing sanctions" and extends to "a full range of litigation abuses."  *Id.* (quoting *Chambers*, 501 U.S. at 44).

"The key to unlocking a court's inherent power is a finding of bad faith."  *Id.* at 1316.  "[W]illful disobedience of a court order" is sanctionable conduct. *Chambers*, 501 U.S. at 45; *In re Sunshine Jr. Stores, Inc.*, 456 F.3d 1291, 1304 (11th Cir. 2006) ("A party . . . demonstrates bad faith by . . . hampering enforcement of a court order.").  "[O]utright dismissal of a lawsuit . . . is a particularly severe sanction, yet is within the court's discretion."  *Chambers*, 501 U.S. at 45.  Lesser sanctions, such as an assessment of attorney's fees, are "undoubtedly within a court's inherent power."  *Id.* "[A] court may assess attorney's fees as a sanction for the willful disobedience of a court order."  *Id.*

Before a court may impose inherent authority sanctions, due process protections must be afforded.  *In re Mroz*, 65 F.3d 1567, 1575 (11th Cir. 1995). "Due process requires that the attorney (or party) be given fair notice that his conduct may warrant sanctions and the reasons why."  *Id.*  "Notice can come from the party seeking sanctions, from the court, or from both."  *Id.*  "[T]he accused must be given an opportunity to respond, orally or in writing, to the invocation of such sanctions and to justify his actions."  *Id.* at 1575-76. Additionally, "when exercising its discretion to sanction under its inherent power, a court must take into consideration the financial circumstances of the party being sanctioned."  *Martin v. Automobili Lamborghini Exclusive, Inc.*, 307 F.3d 1332, 1337 (11th Cir. 2002).

Finally, if a sanction is so punitive that it amounts to a criminal sanction, the contemnor is entitled to criminal procedural safeguards.  Thus, a civil sanction must generally be "designed to compensate a complainant for losses or to coerce a party into complying with a court order."  *In re E.I. DuPont De Nemours & Company-Benlate Litigation*, 99 F.3d 363, 368 (11th Cir. 1996) (holding that if the district court imposes sanctions in order to "vindicate its authority by punishing the contemnor," the court must afford the party with the necessary procedural safeguards) (citing *International Union, United Mine Workers of America v. Bagwell*, 512 U.S. 821, 826-27 (1994)).

Nonetheless, a sanction does not necessarily require criminal procedural safeguards simply because one motivation for the sanction is to deter similar

misconduct in the future.  *See Malautea v. Suzuki Motor Co., Ltd.*, 987 F.2d 1536, 1546 (11th Cir. 1993) (affirming the imposition of a fine on the defendants and their counsel imposed pursuant to the district court's inherent power to control the proceedings before it finding that the fines "justly punished the defendants and their attorneys and, hopefully, will deter other litigants from engaging in similar activity"); *Kleiner v. First Nat'l Bank of Atlanta*, 751 F.2d 1193, 1210 (11th Cir. 1985) (citation omitted) (upholding civil sanction of a $50,000 fine imposed on counsel for intentional misconduct, including lying on the stand).  "Since dismissal is available for purposes of deterrence, stiff monetary penalties would certainly be appropriate, at least as long as they did not equal or exceed the damages which would be awarded in dismissal." *Kleiner*, 751 F.2d at 1210.

The Court has provided the Relators with appropriate due process procedures in connection with the imposition of sanctions.  The Court, therefore, considers these substantive principles of law in fashioning the appropriate monetary sanction here.

### B.    Appropriate Monetary Sanction

After careful consideration, the Court determines that the repayment to the Government of $1.61 million of its FCA award, paid equally by Relators, is an appropriate sanction under the unique circumstances of this case.

This amount represents a substantial consequence for the Relators' blatant disregard for their *qui tam* duties.  The Relators knew that their disclosures were

a violation of the Court's seal orders but continued nonetheless, exhibiting a "considerable lack of good faith." *Pilon*, 60 F.3d at 999. By engaging in inappropriate communications with the media while under a Court order to stay quiet, Relators tarnished and jeopardized their "whistleblower" representative role on behalf of the Government, and by extension, the very servicemen and women whose rights they seek to vindicate in this action. This sanction is also designed to promote Relators' compliance with the statutory provisions of the FCA as well as judicial orders framed to protect the integrity of the FCA litigation process and its public purpose and benefits. *See Malautea*, 987 F.2d at 1546 (affirming a sanction which was sufficient to deter other litigants from similar misconduct).

This sanction takes into account what amount would appropriately compensate the Government. Here, although the Government admits that the seal violations resulted in no actual harm to the Government's investigation of this case, the Government was harmed in another way. As the Government explains, had it known the Relators were actively violating the seal, it would not have agreed to award them any more than the statutory minimum, instead retaining this amount ($2,736,500) for its use on the public's behalf. Likewise, had the Court been aware of the Relators' consistent disregard for its seal orders, it would not likely have approved an award of $2.7 million above the statutory minimum. *See* 31 U.S.C. § 3730(d) (leaving it to the court to decide whether an award between 25 and 30 percent of the proceeds is reasonable). In other words,

because the Relators concealed the nature and extent of their seal violations from both the Government and the Court, Relators were able to receive a larger award than they otherwise would have.

On the other hand, requiring the Relators to repay every penny they received over the statutory minimum fails to take into account the full context of the seal violation.  Although their conduct was unquestionably inexcusable, the Court also must take note of the Relators' explanation of what drove them to breach the seal.  As Relators explained, this case remained under seal for years, all the while Relators watched as the fraud they complained of allegedly continued in the midst of the nation's severe economic and foreclosure crisis triggering the federal loan guarantees attached to veterans' mortgages at issue here.  Out of frustration, Relators admit they impermissibly contacted various media representatives.[16]  This was a grand error in judgment and violation of Court orders for sure.   Still, the Relators apparently believed that their communications with the media would remain private until the seal was lifted. The fact that their communications remained private does not absolve the Relators of culpability.  However, a full understanding of the impetus behind their actions and the context of their seal violations remains important in

---

[16] Relators could have, alternatively, opposed the Government's requests for extensions of the seal.  Instead, around the time Relators began violating the seal, their counsel expressly noted to the Court their lack of opposition to the Government's requests, and they continued to do so through late 2011, when they ultimately opposed another extension.

evaluating a proper sanction.[17]  At the same time, the Court must account for the reality that the Relators flagrantly disregarded their legal obligations of total confidentiality under the Court's seal orders.

The Court also considered the Relators' ability to pay this hefty sanction. "Sanction orders must not involve amounts that are so large that they seem to fly in the face of common sense, given the financial circumstances of the party being sanctioned." *Martin v. Automobili Lamborghini Exclusive, Inc.*, 307 F.3d 1332, 1337 (11th Cir. 2002).  On the other hand, "sanctions must never be hollow gestures; their bite must be real." *Id.*  The sanction the Court imposes today, $1.61 million, is a large sanction indeed, but compared to the millions Relators have been awarded thus far in this case, this amount strikes the appropriate balance.

Likewise, the Court considered that this sanction would be paid in post-tax dollars and has chosen a sanction amount to account for this fact, at least in part, and to ensure that this sanction is not predominantly punitive in nature.  In particular, Relators state that their federal tax rate in 2012 and 2013 was "at least 35% on average."  (Doc. 431 at n.1.)  And the Georgia upper marginal tax rate, which presumably applied to Relators' award, was 6%.  Thus, it appears the $2.7 million Relators' earned above the statutory minimum was likely taxed at about a

---

[17] Wells Fargo contends that the evidence suggests that Relators' actions were financially prompted by their impending business failure in the 2008 and 2009 period, resulting from the collapse of the real estate market.  While the Court does not altogether reject this strand of motivation as a possibility, it concludes that the evidence instead as a whole points to the Relators becoming increasingly obsessed with their whistleblower role and Wells Fargo's alleged misdeeds as the foreclosure crisis exploded.

41% rate, leaving Relators with about $1.61 million. The record contains insufficient evidence to determine the actual amount of taxes Relators paid on this $2.7 million award. And the Court does not consider whatever fee arrangements Relators might have with their counsel,[18] or any other costs associated with this lawsuit. For all the above reasons, the Court finds a reduction of the Government's proposed $2.7 million repayment sanction to $1.61 million is appropriate under these circumstances. With any further reduction, this sanction would lack sufficient teeth and fail to achieve the compensatory effect the Court seeks to achieve.[19]

The Court additionally finds that Relators were equally complicit in these seal violations, and thus equally liable for this repayment. At the evidentiary hearing, Mr. Donnelly testified that he knew and approved of Mr. Bibby's use of the anonymous email account to disclose the sealed *qui tam* lawsuit to third parties. (Doc. 445 at 89.) Furthermore, while many emails at issue came from Mr. Bibby's personal email account, several of these messages requested that Mr. Russell and Ms. Larcom contact both Relators via phone to discuss this case. Accordingly, imposing the sanction equally on the Relators is justified.

Relators' misconduct, even if rooted in their self-defined good intentions, was deliberate and prolonged. While dismissal might be authorized under such circumstances, such harsh action would provide a windfall to Wells Fargo and

---

[18] The Court nevertheless recognizes that contingency fee agreements take a substantial cut of any plaintiff or relator's recovery.

[19] To be clear, this reduction is not intended to be some sort of tax relief, but simply to account for the reality that the Relators did not actually receive the full $2.7 million.

harm the Government (and public) — the very party whose interests were threatened by Relators' seal violations.  With dismissal inapposite, the Court finds this sanction is sufficient to provide proper compensation to the Government, vindicate the the integrity of the judicial process, and accomplish the appropriate deterrent effect.  At the same time, the sanction is tailored to the specific circumstances in this case and is appropriate in light of the monetary awards Relators have recovered to date.

## IV.  Conclusion

For the foregoing reasons, Wells Fargo's Motion to Dismiss [Doc. 409] is **DENIED**.  The Court nevertheless **SANCTION**S Relators for their serious violation of the Court's seal orders.  Relators **SHALL**, within seventy-five (75) days of the entry date of this Order, repay to the Government $1.61 million of the award they have received to date.  In the event Relators determine that, due to their financial circumstances, they are unable to satisfy this repayment obligation within seventy-five (75) days and instead require a repayment plan, they should first attempt to work with the Government to craft an appropriate repayment plan.  If they are unsuccessful in agreeing to a repayment plan, the Government and Relators are directed to promptly file a consolidated statement not to exceed ten (10) pages, notifying the Court why they are unable to reach such an agreement and articulating their respective positions.

Finally, the Court understands that this case has essentially stalled while the Court has considered the appropriate sanctions.  Thus, the parties are now

**DIRECTED** to file a consolidated revised proposed scheduling order within twenty (20) days of the entry date of this Order.

It is so **ORDERED** this 5th day of January, 2015.

Amy Totenberg
**United States District Judge**