**THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.*, | * | |
| VICTOR E. BIBBY and BRIAN J. | * | CIVIL ACTION FILE NO. |
| DONNELLY, | * | |
| | * | 1:06-CV-547-AT |
| RELATORS/PLAINTIFFS, | * | |
| | * | |
| vs. | * | |
| | * | |
| WELLS FARGO BANK, N.A., | * | |
| individually and as s/b/m with | * | |
| WELLS FARGO HOME MORTGAGE, | * | |
| INC., *et al.*, | * | |
| | * | |
| DEFENDANTS. | * | |

**RELATORS' BRIEF IN SUPPORT OF THEIR MOTION FOR
AN AWARD OF THE MAXIMUM RELATORS' SHARE**

On their own, Relators and their counsel prosecuted this case against nine

separate defendants, and have collectively recovered $269,700,000 for the United

States, now including $108,000,000 from Wells Fargo.  Relators brought to light a

massive fraudulent scheme perpetrated by the nation's largest banks against

thousands of veterans and the United States which was unknown to the

Government.  Relators deserve to be awarded the maximum Relators' share – 30%

– for their efforts and for the results they obtained.

Every brick laid to build this case was laid by Relators and their counsel; none by the Government. Relators and their counsel received no help from the Government, except the limited payment information the Government was required to and did belatedly and begrudgingly provide from the VA, often in a form that was of limited utility. Except for that limited information, every piece of evidence gathered, every witness deposed, every motion briefed, every expert prepared, and each false claim proved in this case resulted solely from the efforts of Relators and their counsel.

The purpose of a relator's share in *qui tam* cases is to both encourage whistleblowers to come forward and to reward relators who successfully prosecute *qui tam* cases. *See U.S. ex rel. Johnson Pochardt v. Rapid City Regional Hosp.*, 252 F. Supp. 2d 892, 897 (D.S.D. 2003). "Congress allowed for increased rewards to 'encourage assistance from the private citizenry that can make a significant impact on bolstering the Government's fraud enforcement effort.' Thus, greater assistance results in greater rewards." *Id.* (quoting S. Rep. No. 99-345, at 8).

No Relators could be more deserving of the maximum 30% relator's share than Victor Bibby and Brian Donnelly, who have endured more than eleven years' worth of hardship, hard work, and personal sacrifice to obtain justice. Unlike in most *qui tam* cases, these Relators did not merely "assist" the Government. The

complete opposite is true.  The results obtained in this case were obtained ***only***
because the Relators persevered and prosecuted this case to its conclusion – with
virtually no help and with not inconsiderable hostility from the Government.
Relators respectfully request that their motion be granted and that they be awarded
the full 30% relator's share under 31 U.S.C. § 3730(d)(2).[1]

## I.      Legal Standard

Under the False Claims Act, the relator is entitled to 25% to 30% of the
recovery in a non-intervened *qui tam* case.  31 U.S.C. § 3730(d)(2).  The amount
of the relator's share is left to the Court's discretion.  *Id*.; *see also U.S. ex rel.
Alderson v. Quorum Health Group, Inc.*, 171 F. Supp. 2d 1323, 1331 (M.D. Fla.
2001).  The FCA has no specific factors to consider when deciding what the
relator's share should be in a non-intervened case.  For intervened cases, the FCA
provides that the relator's share should reflect "the extent to which the person
substantially contributed to the prosecution of the action."  31 U.S.C. § 3730(d)(1).
In this non-intervened case, Relators' 'contribution' was "substantially"
*everything.*

---

[1] As stated in Relators' motion, because the Government has already paid the
minimum 25%, Relators request that the Court order the Government to pay
Relators an additional 5% ($5,400,000) of the recovery from Wells Fargo so that,
in total, Relators are awarded 30% under 31 U.S.C. § 3730(d)(2).

In the legislative history of the 1986 amendments to the FCA, Congress did outline three factors it believed relevant to determining the relator's share. The majority of courts have used those three factors to decide the relator's share issue. The three factors are: "(A) the significance of the information provided to the Government; (B) the contribution of the person bringing the action to the result obtained; and (C) whether the information which formed the basis for the suit was known to the Government." *See* S. Rep. No. 99-345, at 28 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5293. Congress has stated: "In those cases where the person carefully develops all the facts and supporting documentation necessary to make the case and presents it in a thorough and detailed fashion to the Justice Department as required by law, and where that person continues to play an active and constructive role in the litigation that leads ultimately to a successful recovery to the United States Treasury, the Court should award a percentage substantially above [the minimum] and up to [the maximum]." 132 Cong. Rec. H9382-03 (Oct. 7, 1986).

Applying those three factors to the issue of Relators' share in this Wells Fargo case, as to "A," all information of "significance" was "provided" by Relators and their counsel; as to "B," the 'contributions' of the Relators and their counsel alone caused "the result obtained"; as to "C," the Government was unaware of

either the fraud or the evidence developed by Relators and their counsel that forced Wells Fargo to pay $108 million.

Congress' clear intent was for relators who successfully prosecute *qui tam* cases, particularly without any assistance from the Government, to be awarded a high relator's share. *See Johnson Pochardt*, 252 F. Supp. 2d at 897.[2]

In *U.S. ex rel. Pedicone v. Mazak Corp.*, 807 F. Supp. 1350, 1353 (S.D. Ohio 1992) (overruled on other grounds), a non-intervened case, the district court awarded the relator the full 30% relator's share. The court found that the relator "pursued this action at considerable personal and professional expense to himself" and that "[a]n award of 30 percent of the settlement would encourage other potential whistleblowers to take risks similar to those taken by the *qui tam* Plaintiff in this matter to expose fraud against the United States." *Id.*[3]

---

[2] *See also U.S. v. NEC Corp.*, 11 F.3d 136, 138 (11th Cir. 1993) ("The harm suffered by a relator can be quite substantial, and the FCA's *qui tam* provisions are intended to remedy this harm. Because the harm suffered by a *qui tam* relator is often the type that is difficult or incapable of measurement, Congress chose to compensate these individuals by awarding them a percentage of the government's recovery.").

[3] The court also did "not find any support for the government's position that the qui tam Plaintiff's share should differ depending upon whether the case is settled or tried" and was unconvinced that a relator should be awarded a lower share merely because the case settled before trial. *Pedicone*, 807 F. Supp. at 1353.

In *U.S. ex rel. Rigsby v. State Farm Fire and Cas. Co.*, a non-intervened case, the district court awarded the relators the full 30% relator's share.  No. 1:06-CV-433-HSO-RHW, 2014 WL 691500, at *7 (S.D. Miss. Feb. 24, 2014), *aff'd in relevant part*, 794 F.3d 457 (5th Cir. 2015), *aff'd in relevant part*, 137 S. Ct. 436 (2016).  The district court found that 30% was warranted because the case had "been pending for nearly eight (8) years" and the relators' counsel had "litigated this case for over five and a half (5½) years, responding to numerous dispositive motions and voluminous pleadings."  *Id.*  The court found that "Relators have shouldered the entire burden of prosecuting this matter and bringing the McIntosh claim to verdict" and that "Given the extensive amount of time and effort expended and the significant expenses incurred by Relators, without any involvement by the Government, the Court finds that the maximum 30 percent share is an appropriate award for Relators."  *Id.*; *see also U.S. ex rel. DRC, Inc. v. Custer Battles, LLC*, No. 1:04-CV-199, 2009 WL 3756343, at *2 (E.D. Va. Oct. 14, 2009) (also awarding a full 30% relator's share in a non-intervened case).

In *U.S. ex rel. Alderson v. Quorum Health Group, Inc.*, an intervened case, the district court awarded the relator 24% (out of the maximum 25% for an intervened case).  171 F. Supp. 2d at 1338.  The court found that the relator "deserve[d] a robust share of the settlement proceeds" because "the significance of

his disclosures [was] indisputable," that "years passed and an heroic effort by many, including prominently Alderson and the team he assembled, contributed to the development of the factual information, documentary evidence, and legal arguments necessary to prevail," and, further, that "the weight and importance of Alderson's initial allegations and his knowledge of hospital cost accounting formed the enduring foundation upon which the multi-million dollar recovery stands." *Id.* at 1332.

The court also found that the "case history demonstrate[d] clearly that Alderson and his team contributed decisively to nearly every aspect of the case from the initial investigation to the conclusion of mediation" and that the "record establishe[d] beyond question that the United States viewed the case cautiously, if not skeptically, for several years and that, absent Alderson's actions and those of his counsel, the United States would have declined intervention." *Id.* at 1332-33. "Indeed, absent the commitment of crucial resources by Alderson and his counsel, which commitment the United States admits was 'uncommon' and 'unusual,' the United States likely would have been forced to decline the case." *Id.* at 1333 (cit. omitted). The court also found the Government had no knowledge of the defendant's fraudulent practices in that case before the relator brought the fraud to the Government's attention. *See id.*

In *U.S. ex rel. Johnson Pochardt v. Rapid City Regional Hosp.*, another intervened case, the district court awarded the relator 24% (out of the maximum 25%). 252 F. Supp. 2d at 905. The court awarded 24% because the court found the relator was "privy to documents, conversations, and information that she relayed to the government" and that the "large amount, the detailed nature, and the steady flow of information indicate that [relator] significantly contributed to the government's knowledge of [defendants'] activities." *Id*. at 897-98. The court also found that information from the relator "essentially established the claims brought against the defendants" and that the relator "assisted the government in building a case" by "personally analyz[ing] figures to determine whether violations were occurring at RCRH." *Id*. at 898. The relator and her attorneys "researched the type of damages recoverable under the Stark Law and whether treble damages were available for this claim under the False Claims Act" and they "participated in the settlement negotiations and helped negotiate the sizable settlement." *Id*. Lastly, the court found that there was "no evidence that the government would have discovered the defendants' actions in this case had [relator] not spoken out." *Id*. at 899.[4]

---

[4] *Cf. U.S. ex rel. Simmons v. Samsung Electronics America, Inc.*, 116 F. Supp. 3d 575, 578-80 (D. Md. 2015) (awarding the relator 18% in an intervened case where the relator "was unable to provide further knowledge of the scheme beyond the

## II.    Argument

Victor Bibby and Brian Donnelly deserve no less than the maximum 30% relator's share from the Wells Fargo recovery.  The Relators uncovered a nationwide fraudulent scheme, of which the Government had no prior knowledge, and recovered $108,000,000 from Wells Fargo with no significant and no voluntary assistance from the Government.  The factors in the Senate legislative history weigh totally in favor of a 30% relator's share for Victor Bibby and Brian Donnelly given their efforts and the results they obtained in this case.

### A.    The Relators provided the direct proof that every major lender for whom they originated IRRRLs was fraudulently bundling unallowable fees into allowable fees, including Wells Fargo.

Relators filed this case under seal on March 8, 2006.  When this case was filed, Relators and their counsel disclosed "significant…factual information, documentary evidence, and legal arguments" in support of their disclosure of this fraudulent scheme.  *Johnson Pochardt*, 252 F. Supp. 2d at 897.  Like the relator in *Johnson Pochardt*, Mr. Bibby and Mr. Donnelly were "privy to documents, conversations, and information that [they] relayed to the government" proving that

---

allegations contained in the complaint and in the disclosure statement," did not contribute other than providing search terms to the Government, and "neither participated in settlement negotiations nor did he help negotiate the settlement amount.").

a fraudulent scheme was happening across the country involving thousands of veterans' IRRRLs.  *See id.*

Relators provided the Government HUD-1s and fee sheets from their own loan files that proved every major lender with whom they worked was defrauding veterans and making false claims to the Government by concealing unallowable fees within allowable fees on IRRRLs, including Wells Fargo.  *See* Bibby Affidavit ¶¶ 4-7 (Ex. A).  Those HUD-1s and fee sheets clearly proved that unallowable settlement, closing, and attorney's fees were concealed within allowable fees for title examination, search, and insurance.  *See id.*  Relators provided expertise about how the IRRRL business worked, and they provided specific VA documents and federal regulations supporting their case.  *See id.* at ¶¶ 4-8.  With respect to Wells Fargo, Relators revealed instructions they received personally from Wells Fargo employees to "bundle" or "shift" unallowable fees into allowable fees when originating Wells Fargo IRRRLs.  *Id.* at ¶ 6; *see also* Doc. 1089-2 at 11-17 (Relators' Expert Report) (describing instructions Relators received from Wells Fargo to bundle unallowable fees into allowable fees).  In short, Relators provided all the evidence to prove the case against Wells Fargo except for some VA payment information this Court had to require the

Government to provide.  Relators developed **all** the evidence proving Wells Fargo was guilty of bundling.

The truth is that the Government's "investigation" accomplished nothing at all and contributed nothing at all to the settlement.  All the Government accomplished was to delay the reckoning for 5 ½ years.  Even when the Government had the opportunity to support Relators' legal arguments and potentially make this case more valuable, the Government declined to help.  That deserves reiteration:  the Government declined the opportunity to make this case even more valuable, and to thereby increase the return to the Government and the corpus from which Relators' share, whatever the percentage, would be calculated.

The Government's own investigation provided no documents, evidence, or information whatsoever to aid in the prosecution of this case, except, again, for the limited VA payment information – which this Court made the Government provide.  *Cf. U.S. v. Covington Technologies Co.*, No. CV-88-5807-JMI, 1991 WL 643048, at *1 (C.D. Cal. Oct. 21, 1991) ("relators acknowledged that the Government's investigation and discovery which was undertaken in the instant action 'provided important documents to qui tam Plaintiffs to assist them in prosecutin[ng] their action.' Thus, arguably part of the relators' success was attributable to the Government rather than the relators.").

**B.** **Relators and their counsel prosecuted this case with no help from the Government, and solely through their own efforts recovered $108,000,000 from Wells Fargo.**

After this case languished under seal for over five years, the Government ultimately declined to prosecute the case on September 30, 2011. Since the Government declined to prosecute *any* of the defendant lenders, Relators and their counsel have collectively recovered $269,700,000 from the defendants who have settled in this case, now including $108,000,000 from Wells Fargo. There would have been *no* recovery without the Relators and their counsel – who had no guarantee of success and who assumed all of the risk in very actively litigating this case against Wells Fargo over the last six years.

Relators amassed all of the evidence, supported by their own expert testimony, proving a fraudulent scheme involving 4,097 Wells Fargo loans that went to claim, on which Wells Fargo charged illegal fees, closed over a twenty-one year time period (1992-2013), in all fifty states plus the District of Columbia. *See* Doc. 1089-11 (Relators' Revised Exhibits A, Addendum to A, and B, listing the loans at-issue in this case). The extent of Wells Fargo's fraudulent scheme, and the extent to which Wells Fargo made false claims, would not have been uncovered without Relators' efforts.

Relators identified and deposed eleven different Wells Fargo loan closers and closing managers, located across the United States, each of whom Relators proved had instructed settlement agents to bundle unallowable fees into allowable fees.  Relators also deposed seven Wells Fargo executives whose testimony proved beyond any doubt that Wells Fargo knowingly submitted false claims to the Government.  The Government's lawyers *did not even attend* any of those eighteen depositions, and provided no input to deciding whom to depose, or what questions to ask, or what Wells Fargo documents to use in cross examination.  Those eighteen depositions were a key to this case.  Figuring out whom to depose and how to build the case through cross examination of those witnesses using Wells Fargo's own documents took arduous work, done solely by Relators and their counsel.

Relators spent *5,135 hours of their own time* serving as expert witnesses in the Wells Fargo case.  Bibby Affidavit ¶ 13 (Ex. A).  The Relators reviewed over 60,000 Wells Fargo HUD-1 settlement statements (plus thousands of other Wells Fargo loan file documents), prepared their own expert report, and were each deposed three times in this case, including one deposition each as expert witnesses. *See id*. at ¶ 10; *see also* Doc. 1089-2 at 25 (Relators' Expert Report).  The Relators' review of 60,000 Wells Fargo HUD-1s (including all "final" and

"preliminary" HUD-1s) and other Wells Fargo documents to find those loans where Wells Fargo "bundled" or "shifted" unallowable fees into allowable fees on the HUD-1 culminated in Relators' "Exhibits A and B" listing the at-issue loans. *See* Bibby Affidavit ¶¶ 10-12; *see also* Doc. 1089-11 (Relators' Revised Exhibits A, Addendum to A, and B).  Those spreadsheets were created solely from the efforts of Relators and their counsel, with no help from the Government.

Relators also hired three other highly competent experts who provided significant testimony in this case regarding reasonable and customary rates for title work and title insurance (Mr. Alexander and Mr. Todd), and a sophisticated statistical estimation of the Government's damages using VA claim payment data (Dr. Hubele).  *See* Docs. 1082-2, -3 (Alexander's Expert Reports), 1081-2 (Todd's Expert Report), 1086-2 (Dr. Hubele's Expert Report).  Each of Relators' experts provided crucial testimony in support of Relators' case.  The Government did not hire any experts, contribute to the cost of Relators' experts, help prepare the experts, nor did the Government *even attend* the deposition of a single expert witness in the case (neither Relators' nor Wells Fargo's).  In a case such as this, expert testimony is important.  Relators as experts, and their expert witnesses, were unimpeachable; Wells Fargo's experts were destroyed – and the Government contributed not one dime nor one thought to any of that.

Relators' counsel have collectively spent *33,014 hours* prosecuting the Wells Fargo case, with no guarantee of payment – hours that were totally uncompensated for the last eleven years this case has pended and the last six years this case was actively litigated. *See* Peak Affidavit ¶ 5 (Ex. B). Relators' counsel also incurred $1,137,533.80 in expenses – paid out of their own pockets – in the prosecution of this case. *Id*. at ¶ 6. The veracity of the foregoing claims and the quality of the work done is attested to by the fact Wells Fargo itself elected not to contest Relators' claims for statutory attorney's fees and expenses.

How many hours the Government's lawyers spent working on this case is unknown and unstated by the Government, but almost none of those hours contributed to Wells Fargo's decision to pay $108 million to settle this case.

Wells Fargo produced 4,124,460 pages of documents in this case. *See id*. at ¶ 7. The Relators and their counsel were the only ones to comb through and review those documents to find the key evidence proving this case. *Id*. at ¶ 8. The Government and its lawyers did not review a single page of the evidence produced. *Id*.

Relators recognize that Relators' counsels' fees and expenses are subject to their own award provision under the FCA, but the significant investment of time and money on the part of Relators and their counsel is relevant to the amount of

relator's share because it reflects the degree of work that was required by Relators and their counsel to obtain the $108,000,000 recovery from Wells Fargo.

Relators' and their counsel's time investment, with no guarantee of success or recovery, should weigh heavily in favor of awarding the maximum relator's share. Delay in recovery, without the guarantee of success, is a substantial factor that the Supreme Court has held weighs in favor of applying a multiplier to the award of attorney's fees in a case in which such fees are awarded. In *Missouri v. Jenkins by Agyei*, the Supreme Court held:

> Clearly, compensation received several years after the services were rendered…is not equivalent to the same dollar amount received reasonably promptly as the legal services are performed, as would normally be the case with private billings. We agree, therefore, that an appropriate adjustment for delay in payment—whether by the application of current rather than historic hourly rates or otherwise—is within the contemplation of [§ 1988].

491 U.S. 274, 283-84 (1989).

The same logic should apply to the relator's share award: the fact a relator invests significant time and money in the prosecution of a *qui tam* case in which the Government does not intervene, over the course of eleven years, without any guarantee of success, should weigh heavily in favor of awarding the maximum relator's share, particularly where there is a highly successful recovery.

The Government's time investment pales in comparison to that of Relators and their counsel.  The Government's lawyers offered no helpful input or advice about strategy to help Relators prosecute this case, attended only those hearings they were ordered to attend, and contributed nothing to building the case against Wells Fargo, except, again, the limited payment information from the VA.  After this case was unsealed, the Government did not issue a single subpoena, did not send a single discovery request, and did not take or even attend a single deposition except for the two depositions of VA personnel, and then the Government's effort was not to help prosecute this case – to put it mildly.[5]  Relators conducted *all* of the discovery in this case.

The only evidence the Government provided to Relators in this case was some payment information proving about payments to Wells Fargo by the VA, which information was used, *in part,* to calculate damages.  Relators first requested that information from the Government on December 17, 2013.[6]  It took the Government almost two years – until October 2015 – even to produce that information in a useable format, and even then it was incomplete.  Other than that

---

[5] For example, the Government's lawyer objected *59 times* during the cross examination of VA witness London by Relators' counsel.

[6] *See* Ex. C (2013-12-17 May Letter to Wynn).

limited payment information, the Government did not provide any critical documents, evidence, or information that aided the prosecution of this case.

Of the 1,338 PACER entries in this case, only 22 of those entries were filed by the Government (not including leaves of absence for the Government's lawyers).[7]  Most of the Government's filings were either stipulations to the dismissal of the defendants who previously settled, statements about the VA's grudging production of some payment information, or filings related to the seal violations – none of which advanced the merits of this case towards the successful results Relators alone obtained.

Relators, on the other hand, responded to every motion filed in the Wells Fargo case, including two motions to dismiss, two motions to compel, five motions for protective orders, the motion for partial summary judgment, the motion for summary judgment, and all five of Wells Fargo's *Daubert* motions.  Relators also had to litigate Wells Fargo's baseless appeal to the Eleventh Circuit after its Motion to Dismiss the Relators was denied, which included filing a motion to dismiss for lack of appellate jurisdiction as well as a response brief on the merits of

---

[7] *See* Docs. 59, 277, 278, 279, 280, 281, 302, 324, 354, 356, 428, 476, 489, 538, 555, 640, 650, 671, 668, 746, 773, and 1187.

Wells Fargo's appeal.  *See* Relators' Mtn. to Dismiss, Jan. 30, 2015, and Brief of Relators-Appellees, April 1, 2015, Case No. 15-10279 (11th Cir.).

When this case was resolved against Wells Fargo, Relators' counsel alone negotiated the agreement for Wells Fargo to pay $108 million.  Once the Relators did reach an agreement with Wells Fargo to settle this case on April 4, 2017, it took the Government a full four months (until August 4, 2017) just to get approval of the settlement agreement and a final signature.

If the Government argues that Relators' share in this case should be reduced because this case was settled before trial, that argument should be rejected.  *First*, the FCA makes no distinction regarding the relator's share between cases that are tried and those that are settled before trial.  If Congress intended for relators whose cases settle before trial to receive less of a relator's share, Congress would have so stated.  *Second*, courts routinely reject the argument that a relator whose case settles before trial warrants a lower relator's share because it is without statutory support and because it makes no logical sense.[8]

---

[8] *See Pedicone*, 807 F. Supp. at 1353; *see also U.S. ex rel. Ryan v. Endo Pharmaceuticals, Inc.*, No. 2:05-CV-03450-RK,  2015 WL 4273290, at *4 (E.D. Pa. July 15, 2015) ("In addition, we find the Government's argument that Ryan's share should be lowered since the matter did not proceed to trial, to be counter-intuitive and without statutory support.  Applying the Government's argument to cases like this would punish a relator, such as Ryan, for providing a level of incriminating information that would make the defendant's prospects of winning at

The entire case was predicated upon lay and expert testimony by Relators – testimony Wells Fargo was unable to rebut.  As lay witnesses, Relators testified at length about their experience in the IRRRL business and the direct instructions they received from lenders, including Wells Fargo, to "bundle" or "shift" unallowable fees into allowable fees.  Relators also testified at length as expert witnesses regarding their extensive review of 60,000 Wells Fargo HUD-1s and other documents as well as the reasonable and customary amounts that should be charged for title work fees, which testimony proved beyond any doubt that the loans Relators identified in this case were "dirty" and false claims had been made by Wells Fargo.

The Government cannot know how crucial Relators' work and testimony was: the Government saw none of that.  The Government's lawyers did not attend a single one of Relators' six separate depositions in this case or any of the other twenty-nine depositions in this case (other than those of VA representatives Mr. London and Mr. White).

---

trial less likely.  In essence, a relator would have to be wary of providing too much evidence since this could prevent the garnering of a larger share because the defendant chose to settle…. Finally, the Government's position fails to take into account the resources it saved in not having to litigate the claims at trial.").

The Government's only willing participation in this case was its attempt to claw back money from the Relators in connection with the seal violations, which is telling. The fervor with which the Government's lawyers argued that Relators should be severely punished for their violations of the seal was not replicated elsewhere in this long case – and was never directed against the misfeasor Wells Fargo or any of the other guilty lenders.

Even in the face of that open hostility, and after the Relators were sanctioned $1.61 million because of the seal violations, Relators did not give up and withdraw from this case, as a lot of people might well have done.[9] Instead, Relators doubled down on their prosecution of this case, dedicating a significant amount of their own personal time reviewing the evidence, drafting an expert report, and giving testimony in six separate depositions to recover $108,000,000 from Wells Fargo with absolutely no help from Government lawyers who argued so ardently for them to be sanctioned.

The Government implicitly recognized the quality of Relators' contributions when it voluntarily agreed to relator's shares greater than the 25% minimum for each of the six settlements negotiated by Relators' counsel before the Wells Fargo

---

[9] Nor did Relators withdraw from this case before revealing what they had done or, after disclosing the seal violations, before the Court could enter an order sanctioning them in order to avoid the sanction.

settlement.  *See* Doc. 474 at 26.  *The Government agreed to enhanced Relators'*
*shares even though those prior settlements did not require anywhere near the*
*amount of time and effort to obtain as did the settlement against Wells Fargo*.

The minimum relator's share is the equivalent of a "finder's fee" that a
relator receives just for bringing the fraud to the Government's attention.  *See*
*Alderson*, 171 F. Supp. 2d at 1331.  "This incentive compensation is paid to a
relator 'even if that person does nothing more than file the action in federal court.'"
*Id*. at 1331 n.29 (quoting 132 Cong. Rec. H9382-03 (Oct. 7, 2986)).  Awarding the
Relators no more than 25% in this case would be the equivalent of saying the
Relators did nothing more than bring this fraud to the Government's attention and
that they deserve nothing for what they have endured and accomplished over these
last eleven years.  That would clearly be an unjust result.

### C.   This fraud would have continued had the Relators not spoken up, because the Government had no knowledge of it.

There is no evidence that either the Government or the VA had any
knowledge of lenders' fraudulent practice of hiding illegal closing fees from
veterans and the VA in connection with IRRRLs.  *See* Doc. 1150 at 40, ¶ 54
(WELLS FARGO's Response to Relators' Statement of Undisputed Facts).  The
unrebutted fact is that the Relators were the first to bring this fraudulent scheme to
the Government's attention, which scheme would likely have continued unabated

but for the Relators' actions.  Relators' efforts and their prosecution of this case put a stop to lenders' fraud.  That fact should weigh heavily in favor of awarding Relators a 30% relator's share.

### D.     The seal violations should not preclude Relators from being awarded the maximum relator's share in this case.

The Government may argue Relators should receive no more than 25% of the recovery in this case because of the seal violations.  There is no nexus whatsoever between the seal violations and the relator's share.  What, if anything, should be done about a seal violation is a decision for this Court to make.  This Court made its decision, and sanctioned Relators severely.  This Court did not reserve the option of tripling the sanction, by denying Relators the maximum Relators' share for their prodigious and successful work.  The Relators' share in this case should reflect the effort the Relators put into this case and the recovery they obtained from Wells Fargo.  The Relators' share should not be reduced because of the seal violations.

Relators admitted to violating this Court's Orders.  Relators were punished for those violations.  Relators acknowledged their wrongdoing, took responsibility for it, and paid a whopping $1.61 million sanction, without appealing the Court's Order.  There has never been any evidence that the Relators' seal violations harmed the Government's investigation while this case was under seal, nor any

evidence those seal violations ever harmed or diminished this case against Wells Fargo.  To the contrary, the Relators recovered *more than twice* the amount from Wells Fargo than Relators recovered from *any* of the prior six defendants who settled.

Punishing Relators a second time for the seal violations, after they were ordered to pay $1.61 million back to the Government, would be both unfair and unjustified.  Relators were sanctioned pursuant to this Court's inherent authority. *See* Doc. 474 at 24.  "Because of their very potency, inherent powers must be exercised with restraint and discretion."  *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991).  Sanctions imposed under the Court's inherent authority must be both "reasonable and appropriate."  *Malautea v. Suzuki Motor Co., Ltd.*, 987 F.2d 1536, 1545 (11th Cir. 1993).  Furthermore, there are constitutional limitations on the punishments that may be imposed.  "[T]he Eighth Amendment… limit[s] the government's power to punish….The Excessive Fines Clause [of the Eighth Amendment] limits the government's power to extract payments, whether in cash or in kind, 'as punishment for some offense.'  'The notion of punishment, as we commonly understand it, cuts across the division between the civil and the criminal law.'"  *Austin v. U.S.*, 509 U.S. 602, 609-10 (1993) (internal citations omitted).

Restricting Relators' share because of the seal violations would be neither reasonable nor appropriate. It would be the equivalent of imposing a $7 million[10] sanction on the Relators for actions that the Government admitted caused absolutely no harm and that never resulted in this case being disclosed to a defendant while it was under seal. Forfeiting $7 million because of seal violations that caused no harm would be excessive.

Relators have not, and are not now, attempting to argue with this Court's Order sanctioning the Relators. Relators do, however, strongly dispute that the seal violations have any logical connection to the amount that should be awarded to Relators. The statutory seal had nothing whatsoever to do with the prosecution of this case and the results obtained once the seal was lifted.

## III.    Conclusion

Relators respectfully request that the Court grant this motion and order the Government to pay the Relators an additional 5% of the Wells Fargo recovery, so that Relators are awarded the full 30% relator's share allowed under the False Claims Act. A full 30% relator's share is absolutely warranted in this case, where

---

[10] The $1.61 million sanction imposed by the Court plus the $5.4 million Relators would forfeit from the Wells Fargo recovery if they receive only 25% Relators' share instead of 30%.

$108,000,000 was recovered from Wells Fargo solely through Relators' efforts and with virtually no assistance from the Government.

Respectfully submitted this 15th day of September, 2017.

BUTLER WOOTEN & PEAK LLP

WILBANKS & GOUINLOCK, LLP

BY: s/  James E. Butler, Jr.
JAMES E. BUTLER, JR.
  jim@butlerwooten.com
  Georgia Bar No. 099625
BRANDON L. PEAK
  brandon@butlerwooten.com
  Georgia Bar No. 141605
JOSEPH M. COLWELL
  joseph@butlerwooten.com
  Georgia Bar No. 531527
ROBERT H. SNYDER
  rob@butlerwooten.com
  Georgia Bar No. 404522
2719 Buford Highway
Atlanta, Georgia  30324
(404) 321-1700
(404) 321-1713 Fax

BY: s/  Marlan B. Wilbanks
MARLAN B. WILBANKS
  mbw@wilbanksgouinlock.com
  Georgia Bar No. 758223
TY M. BRIDGES
  tmb@wilbanksgouinlock.com
  Georgia Bar No. 081500
3414 Peachtree Street, N.E., Ste. 1075
Atlanta, Georgia 30326
(404) 842-1075
(404) 842-0559 Fax


PHILLIPS & COHEN


BY: s/  Mary Louise Cohen
MARY LOUISE COHEN
  mlc@phillipsandcohen.com
  DC Bar No. 298299
2000 Massachusetts Avenue, N.W.
Washington, DC 20036
(202) 833-4567
(202) 833-1815 Fax

Attorneys for Relators/Plaintiffs

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rules 5.1(B) and 7.1(D), I hereby certify that the foregoing filing complies with the applicable font and size requirements and is formatted in Times New Roman, 14 point font.

s/  James E. Butler, Jr.
JAMES E. BUTLER, JR.
  Georgia Bar No. 099625
BRANDON L. PEAK
  Georgia Bar No. 141605
JOSEPH M. COLWELL
  Georgia Bar No. 531527
ROBERT H. SNYDER, JR.
  Georgia Bar No. 404522
Butler Wooten & Peak LLP
2719 Buford Highway
Atlanta, Georgia  30324
(404) 321-1700
(404) 321-1713 Fax

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on September 15, 2017, I electronically filed RELATORS' BRIEF IN SUPPORT OF THEIR MOTION FOR AN AWARD OF THE MAXIMUM RELATORS' SHARE with the Clerk of the Court using the CM/ECF system which will automatically send email notification of such filing to the following attorneys of record:

Amy P. Williams
Troutman Sanders LLP
301 South College Street, Suite 3400
Charlotte, NC  28202

Lawrence C. Lanpher
Soyong Cho
Robert W. Manoso
K & L Gates, LLP
1601 K Street, N.W.
Washington, DC  20006

Charles T. Huddleston
Nelson Mullins Riley &
 Scarborough LLP
201 17th Street, N.W., Suite 1700
Atlanta, GA  30363

I certify I have served this document on the following via e-mail:

*United States of America:*
Alan S. Gale
United States Department of Justice
P.O. Box 261
Ben Franklin Station
Washington, DC  20044
 *Alan.Gale@usdoj.gov*

*-and-*
Paris Wynn
Assistant U.S. Attorney
600 U.S. Courthouse
75 Spring Street, S.W.
Atlanta, GA  30303
 *Paris.Wynn@usdoj.gov*

This 15th day of September, 2017.


BY: s/  James E. Butler, Jr.
JAMES E. BUTLER, JR.
  Georgia Bar No. 099625
BRANDON L. PEAK
  Georgia Bar No. 141605
JOSEPH M. COLWELL
  Georgia Bar No. 531527
ROBERT H. SNYDER, JR.
  Georgia Bar No. 404522
Butler Wooten & Peak LLP
2719 Buford Highway
Atlanta, Georgia 30324
(404) 321-1700
(404) 321-1713 Fax