**THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.*, | * | |
| VICTOR E. BIBBY and BRIAN J. | * | CIVIL ACTION FILE NO. |
| DONNELLY, | * | |
| | * | 1:06-CV-547-AT |
|      RELATORS/PLAINTIFFS, | * | |
| | * | |
| vs. | * | |
| | * | |
| WELLS FARGO BANK, N.A., | * | |
| individually and as s/b/m with | * | |
| WELLS FARGO HOME MORTGAGE, | * | |
| INC., *et al.*, | * | |
| | * | |
|      DEFENDANTS. | * | |

**RELATORS' REPLY IN SUPPORT OF THEIR MOTION FOR AN
AWARD OF THE MAXIMUM RELATORS' SHARE**

The Government has no valid response to any of Relators' arguments in
favor of awarding a 30% relator's share.  The Government concedes it contributed
nothing to the successful recovery in this case.  It does not dispute that Relators
brought to light a massive fraudulent scheme affecting thousands of U.S. military
veterans.  It does not dispute that Relators provided the Government at the outset
of this case irrefutable evidence proving this fraud.  It does not dispute the
Government's 5½ year "investigation" accomplished nothing but delay.  It does
not dispute that it declined the opportunity to support Relators' legal arguments,

thereby declining the opportunity to increase the value of this case and ensure an even greater recovery for the United States.  It does not dispute the number of hours Relators personally worked on this case, the number of documents they reviewed, or the extent of Wells Fargo's fraud Relators proved.  It does not dispute the Relators' expertise or the fact that Relators' expertise was the foundation of the $108 million recovery Relators brought to bear.  It does not dispute the irrefutable truth that there would be no recovery at all, much less a $108 million recovery from Wells Fargo – and a collective $269,700,000 recovered for the United States – had Mr. Bibby, Mr. Donnelly, and their counsel not doggedly prosecuted this case.  It does not dispute that Mr. Bibby and Mr. Donnelly put a stop to this fraud.

Left with no way to contest the merits of what Relators did and the results they achieved, the Government has resorted to using overblown rhetoric about Relators' conduct and casting aspersions on Relators and their counsel.  The Government's response is pure vitriol and goes way beyond the pale of making valid arguments about Relators' share.  *See, e.g.*, Doc. 1343 at 1 ("egregious misconduct"), 3 ("deliberate misconduct"), 5 ("violations of FCA procedures"), 6 ("blatant violations," "aberrant," and "aberrant misconduct"), 7 ("offensive to the universe of relators as a whole"), 9 ("flagrant disregard"), 10 n.9 ("unabashed narrative of the woes attendant to the receipt of only $27 million dollars").

The Government's hyperbole is emblematic of its attitude towards Relators and their counsel throughout this case. *See, e.g.,* 2014-06-11 Hr'g Tr. at 173/21-174/6 ("[Government's lawyer]: to the extent the Relators, who are recent millionaires, are pleading poverty and talking…about tax burden in connection with the potential sanction, it might be a good idea to have financial statements in addition to the counsel fee papers submitted in chambers.").

The Government's attitude towards these Relators is unfortunately not unique. Courts throughout the country have recognized the Government's acrimony towards relators in other cases, too. *See, e.g.*, *U.S. v. General Electric*, 808 F. Supp. 580, 583-84 (S.D. Ohio 1992) (cited by the Government repeatedly in its brief) ("The pattern of behavior in these cases by the Department of Justice always has been a mystery….[I]t is worthy of note that the Department of Justice has considered [whistleblowers] as adversaries rather than allies. This is not the first case where this Court has noted the antagonism of the Justice Department to a whistleblower. The reason continues to be unknown, but the attitude is clear.").[1]

---

[1] *See also Gravitt v. General Elec. Co.*, 680 F. Supp. 1162, 1164 (S.D. Ohio 1988) ("For reasons that never have been made clear, the Department of Justice rather than welcome the assistance of plaintiff and his counsel, took every step possible to frustrate their participation. The Department of Justice took no deposition, interviewed no witness and instead confined its efforts to opposing all attempts by plaintiff's counsel to conduct appropriate discovery.").

That the Government treats so poorly the very people who place their livelihoods and reputations on the line to recover money *for the Government* is mind-boggling.

Its rhetoric aside, the Government makes only two arguments in its response, neither of which presents a compelling reason to limit Relators' share to 25%.

*First*, the Government argues Relators should be sanctioned *a second time* for the seal violations. *See* Doc. 1343 at 6-11. This is virtually the Government's only argument. The Government claims it is not advocating for further sanctions, but an additional "punishment, sanction or fine" is exactly what the Government is asking this Court to impose by limiting Relators' share. Doc. 1343 at 9. The word "misconduct" appears *26 times* in the Government's 11½-page brief. By making its principal argument that the Relators' share should be limited because of the seal violations, the Government is absolutely seeking a "penalty or sanction." Doc. 1343 at 2; *see also* Gov't Resp. to WF MTD Relators, Doc. 428 at 3 ("the United States does stress that Relators' repeated and intentional violations of the seal constitute serious misconduct *that does* warrant the imposition of a *significant* monetary sanction.") (emphasis in original).

Relators took responsibility for their actions and were punished harshly. The Government now opportunistically asks this Court to sanction Relators a second time for theoretical harm that the United States never suffered. The

Government glosses over the fact that it admitted the "egregious misconduct" it complains of caused absolutely no harm to the Government's investigation or this case. *See* Gov't Resp. to WF MTD Relators, Doc. 428 at 5 ("the United States is not aware of any actual and/or tangible harm to the government that resulted from Relators' seal violations.").  And the Government cannot dispute that after the "egregious misconduct" it complains of was sanctioned by this Court in the amount of $1.61 million, the Relators went back to work and recovered more than twice from Wells Fargo than was recovered from any other defendant thus far. Instead of thanking Relators for their work, the Government chastises them and attempts to belittle their and their lawyers' significant contributions.

The Government does not cite a single case holding that a seal violation warrants the complete reduction of a relator's share to the statutory minimum (much less a seal violation that caused absolutely no harm whatsoever).[2]  Instead,

---

[2] The Government repeatedly quotes the words "virtually flawless" from the *General Electric* case, *supra*, as if those words had some talismanic significance. The Government never attempts to define what "virtually flawless" means.  In *General Electric*, the relator's "silence facilitated the continuation of the fraud for some period of time," and the relator's share was reduced because he could have brought the fraud forward sooner.  808 F. Supp. at 584.  That contrasts sharply with Mr. Bibby and Mr. Donnelly, who promptly brought this fraud to the Government's attention and who the Government instructed to continue doing business as usual and to change nothing while the Government "investigated" this case.  Any harm caused by delay in this case was solely the Government's fault.

the Government relies upon only a single factor (out of twenty-five) from its own internal "Guidelines" drafted by Government lawyers to support its argument.

The Government claims "[f]or obvious reasons, Relators ignore the [DOJ] Guidelines."  Doc. 1343 at 5 n.6.  The Government is correct; there are obvious reasons for that.  First, the DOJ's "Guidelines" are not the law – they are neither codified in the False Claims Act nor validly passed federal regulations.  *See U.S. ex rel. Alderson v. Quorum Health Group, Inc.*, 171 F. Supp. 2d 1323, 1333 (M.D. Fla. 2001).  The DOJ is not the arbiter of how relator's shares under the FCA are determined.  This Court is, and the Court is not bound by DOJ's "Guidelines."  Second, the DOJ's "Guidelines" "fail to establish a coherent theory under which to determine the relator's share," "contradict one another," and "suffer other theoretical problems and are noticeably unhelpful."  *Id*. at 1334 and n.34.  "In effect, the DOJ guidelines are merely an indiscriminate enumeration of more or less obvious factors, unaccompanied by any indication of comparative weight and more useful as a checklist for negotiation than a rule of decision in an adjudication."  *Id*. at 1334 n.34.

Incredibly, while the Government criticizes Relators for "ignoring" their "Guidelines," the Government "ignores" all of its own factors that warrant increasing the relator's share.  *See U.S. ex rel. Johnson Pochardt v. Rapid City*

*Regional Hosp.*, 252 F. Supp. 2d 892, 899-900 and n.1 (D.S.D. 2003) (listing the

DOJ's "Guidelines" that warrant increasing the relator's share).  The Government

calls it "common sense" that a single factor warrants the complete reduction to the

minimum 25% relator's share.  Doc. 1343 at 5 n.6.  Law school taught us that's not

how factors work.  The Government's "omission" of any discussion of the factors

in its own "Guidelines" that warrant increasing the relator's share is what is, in

fact, "conspicuous."  *Id.*[3]

If the DOJ's "Guidelines" are considered, the weight of the "Guidelines" are

indisputably in favor of increasing the Relators' share in this case:

1. The relator reported the fraud promptly **- Undisputed (when Relators discovered this fraud, they promptly retained counsel and reported the fraud to the Government)**;

2. When he learned of the fraud, the relator tried to stop the fraud or reported it to a supervisor or the Government **- Undisputed (the Relators reported this fraud promptly to the Government)**;

3. The qui tam filing, or the ensuing investigation, caused the offender to halt the fraudulent practices **- Undisputed (instances of bundling committed by WF dropped dramatically after this case was unsealed, and WF claimed it no longer committed bundling)**;

4. The complaint warned the Government of a significant safety issue **- Undisputed (the security of U.S. military veterans' financial interests**

_____

[3] The Government also mentions the three factors in the Senate legislative history (Doc. 1343 at 4), then proceeds to completely "ignore" those factors and refuse to acknowledge that all three of those factors, as discussed fully in Relators' brief, warrant awarding the maximum relator's share of 30% in this case.

should be considered a matter of financial safety; if the Government means something other than financial safety, then this one is irrelevant**);

5.      The complaint exposed a nationwide practice **- Undisputed (*see* Doc. 1340-1 at 12**);

6.      The relator provides extensive, first-hand details of the fraud to the Government **- Undisputed (*see* Relator Bibby's affidavit, Doc. 1340-2**);

7.      The Government had no knowledge of the fraud **- Undisputed (*see* Doc. 1340-1 at 22-23**);

8.      The relator provided substantial assistance during the investigation and/or pre-trial phases of the case **- Undisputed (*see generally* Doc. 1340-1 at 9-22**);

9.      At his deposition and/or trial, the relator was an excellent, credible witness **- Undisputed (and indisputable by the Government, which attended none of Relators' depositions**);

10.     The relator's counsel provided substantial assistance to the Government – **Irrelevant (the Government did not prosecute the case; nevertheless, Relators' counsel did everything**);

11.     The relator and his counsel supported and cooperated with the Government during the entire proceeding – **Irrelevant (the Government did not prosecute this case**);

12.     The case went to trial – **Irrelevant, and illogical (nevertheless, the case was on the cusp of going to trial when it was resolved**);

13.     The FCA recovery was relatively small **- Irrelevant, and illogical**;

14.     The filing of the complaint had a substantial adverse impact on the relator – **Undisputed (Relators had to leave the mortgage lending industry,**

**and Relators have endured eleven years' worth of hardship to see this case to its conclusion**).

The Government "ignores" these factors that warrant increasing the Relators' share "for obvious reasons." Doc. 1343 at 5 n.6. No matter whether the Court follows the factors from the Senate legislative history or the DOJ's "Guidelines," each of those standards warrants awarding Relators significantly more than the 25% statutory minimum, and neither standard demands awarding no more than the statutory minimum due to seal violations that caused no harm.

*Second*, aside from its argument that Relators should be sanctioned a second time for conduct that did not harm it in any way, the Government's only other argument is that Relators' award should be reduced because Relators have recovered too much money for the United States and because the Government claims Relators' work has been "unremarkable." Doc. 1343 at 11.

The size of the recovery is irrelevant to the Relators' share. The relator's share in a FCA case is not determined by the amount of the recovery; it is, instead, a set range of percentages, and the percentage to be awarded – based on work done and success achieved – is up to the Court. If Congress intended for relators who recover large sums for the United States to be awarded lower shares, then Congress could have drafted the FCA to reflect that intent. Instead, Congress set a range of percentages and did not include a provision for decreasing the relator's share when

9

the relator's efforts resulted in a large recovery.  Any percentage awarded above the 25% minimum should be a reflection of the relator's efforts required to obtain the recovery.[4]  If the Government believes relators' shares in *qui tam* cases should be on a sliding scale that dis-incentivizes relators from recovering *more* money *for the Government*, then that is an argument to be made to Congress, not this Court.  It is an exceedingly dumb argument, self-defeating, and plainly counterproductive.

The Government's argument that "high settlements warrant smaller awards" (Doc. 1343 at 11) has been rejected by other courts, because it is not supported by the text of the FCA and is contrary to basic common sense and not in the Government's own best interest.  *See, e.g., U.S. ex rel. Ryan v. Endo Pharmaceuticals, Inc.*, Nos. 05–3450, 10–2039, 11–7767, 2015 WL 4273290, at *5 (E.D. Pa. July 15, 2015).  In *Endo Pharmaceuticals*, the court found that "the Government's interpretation [that larger recoveries warrant smaller relator's shares] is contrary to the explicit language of the statute."  *Id*.  The court found that "If Congress had intended limitations, like in the case of large awards, it would

---

[4] The Government's arguments about the difference between the minimum relator's share in an intervened versus non-intervened *qui tam* case is equally irrelevant.  Whatever the Relators' share may have been had the Government intervened in this case is beside the point.  The issue before the Court is whether Relators' efforts in this non-intervened case, and the results they obtained, warrant awarding more than the minimum 25%.  Relators submit that their efforts indisputably warrant more than the minimum 25%.

have explicitly included them within the statutory framework of the FCA.

Congress' silence on this issue compels rejection of the Government's argument."

*Id*.  The court noted that "the Government has failed to include any legal precedent

affirming this argument, and thorough research by this Court has failed to unearth

any such support."  *Id*.[5]

The Government's argument that larger awards warrant smaller relator's

shares is also bad policy.  It is a race to the bottom that discourages relators from

doing the difficult work in a *qui tam* case that can turn a good case into a great

case.  It makes equally little sense to argue the inverse: that smaller recoveries

warrant a larger relator's share, which would mean United States taxpayers would

net less money as a result of the relator being paid a higher percentage.  The

---

[5] *See also United States ex rel. Merena v. SmithKline Beecham Corp.*, 52 F. Supp.
2d 420, 434 (E.D. Pa. 1998), *rev'd on other grounds*, 205 F. Supp. 3d 97 (3d Cir.
2000) ("There is nothing in the statute to suggest that the amount of the total
recovery is, or should be, an appropriate consideration in determining the
percentage range or in calculating the total *qui tam* award.  Had Congress intended
the amount of the award to be a relevant factor in establishing the percentage of the
recovery, it could have simply enumerated this as a relevant factor to be
considered, or Congress could have directed a sliding scale of percentages
depending on the dollar amount of the recovery.  Obviously, Congress had to be
well aware that a *qui tam* Relator could indeed recover a very large sum of money
as a *qui tam* award if the civil recovery that [the] Government obtained from the
defendant was also very large.  *Therefore, I do not consider the amount of the total
settlement to be a relevant factor in determining what percentage of the recovery
should be paid to a qui tam relator*." (emphasis added)).

Government may be the only institution in the United States that wants to dis-incentivize people from working harder to obtain better results.

The Government's argument is also refuted, as a matter of fact, by the relator's shares to which Government has agreed in other cases in this Court and elsewhere. In *U.S. ex rel. Vainer v. DaVita Inc.* (No. 1:07-CV-2509-CAP, N.D. Ga.), the DOJ agreed to a 28% relator's share ($126 million) from a $450 million recovery in that non-intervened case. *See* Gov't "Fact Sheet" (Ex. 1 hereto).[6] If the Government's argument was sincere, one would expect the Government to insist upon the statutory minimum in that case. That same "Fact Sheet" shows the Government has apparently agreed to relators' shares in other FCA cases in amounts of $131 million, $106 million, $140 million, $86.3 million, $98 million, $108.7 million, $97.3 million, $44.1 million, $37.8 million, $45 million, $56.2 million, $49.8 million, $39 million, $66 million, $45 million, $31.8 million, $47 million, $63.8 million, $31.66 million, $48.75 million, and $40 million. *Id.* All of those exceed the $27 million the Government labels "unreasonable" in this case.

Chinese philosopher Confucius said: "The beginning of wisdom is to call things by their proper name." There are reasons the Government began its brief

---

[6] Source: https://www.justice.gov/opa/press-release/file/918366/download (last visited October 17, 2017).

with the number $27 million italicized and repeated that number 12 more times in 12 pages.  They are the same reasons the Government referred to Relators as "recent millionaires . . . pleading poverty."  The reasons are envy and disdain for the Relators *who proved this case the Government rejected.*

The Government hopes this Court will abdicate its responsibility to select a percentage based on what Relators actually did and the success they actually obtained just because $27 million is a lot of money.  Congress did not charge this Court with determining whether the minimum percentage is a lot of money.  It charged this Court with selecting a percentage based on the quality of the work performed and the results obtained.  Relators are confident the Court will faithfully determine the percentage Relators are due without letting the final monetary sum that percentage yields dictate its analysis.

The Government also argues Relators' work in this case was neither "exceptional" nor "remarkable."  Relators—and apparently Wells Fargo— respectfully disagree.  The Government has no evidence to support its self-serving statement that "the Government's substantial and national knowledge regarding *qui tam* lawsuits, the volume of documents reviewed personally by Relators and the number of depositions described in Relators' motion and the attached affidavits

are, by large FCA litigation standards, entirely unremarkable." Doc. 1343 at 11.

That statement is pure *ipse dixit*.

The amount of time, effort, and resources required to obtain this result have

been massive. The Court's docket irrefutably proves that truth. The Court alone:

- Issued 201 orders;
- Held 11 in-person hearings;
- Held 8 telephonic hearings; and
- Managed a docket with over 1,343 entries to date.

Relators requested a hearing for a good reason: there are things we'd like to

show the Court *in camera* (and Government counsel can see them, too) but not

spread on a public record. An example would be "screenshots" of the computer

directories and subdirectories maintained by Relators' counsel – with thousands

and thousands of 'files' created – which is to say written – by counsel and saved.

Plus screen shots of the thousands of emails related to this case. Relators' counsel

have never seen a case in which lawyers at Relators' lead counsel firm have

created so much *work* – no other case comes close.

By way of example, Relators' lead counsel firm's electronic "Bibby" file

includes some *839,722 files* (word documents, PDFs, and others) in *22,876 "sub"*

*directories* (consisting of all the Bibby "cases," and not limited to just Wells

Fargo). It would take *15,000 sheets of paper* to print lists of just the file names. It

14

would take literally months to take screenshots of those directories.  Those files consist of *652 GBs of data.*[7]  Relators' counsel have also sent or received some *300,000 emails* related to the Bibby cases.

The record, the unrebutted facts, and the Court's own knowledge of the complexity and ferocity of this litigation prove that Wells Fargo paid $108 million only because of the extraordinary efforts of Relators and their counsel.

## CONCLUSION

The Government's hostility towards the Relators who have recovered $269,700,000 in these cases for the United States is inexplicable.  Equally inexplicable is the Government's refusal to do anything to increase or protect the United States' potential recovery in these cases.  *See, e.g.,* Doc. 486 at 3 n.2, 35, 38, Case. No. 1:12-CV-04020-AT, *U.S. ex rel. Bibby v. Edwards & MIC*; Doc. 860 at 35, 40-41, Case. No. 1:12-CV-04020-AT, *U.S. ex rel. Bibby v. Edwards & MIC*. Whatever the source of the Government's antagonism, it is entirely irrelevant to the matter of Relators' share in this case and presents no compelling reason to limit Relators' share to the statutory minimum.

---

[7] Those numbers *do not include* the "drafts" directory for Bibby maintained by Relators' lead counsel, which alone includes thousands of documents on which he worked, and dozens of sub-directories.

This case has lasted nearly twelve years.  Relators have prosecuted this case against nine separate defendants, serving as fact and expert witnesses, while facing considerable push back from the Government they are trying to help.  Relators respectfully submit that their efforts warrant awarding an additional 5% from the Wells Fargo recovery.  ***Relators respectfully request that their motion be granted***.[8]

*[signatures continued on next page]*

_____

[8] Regarding an evidentiary hearing on this motion, it's telling the Government does not want the Court to hear evidence and testimony as to the issue of Relators' share.  If the Court permits such an *in camera* hearing, suffice it to say the Court will understand why.  The joint prosecution privilege is no reason to deny a hearing.  The joint prosecution privilege protects against disclosure to the defendants, not the Court itself, who is the arbiter of such claims.  Relators submit that the evidence to be tendered at such *in camera* hearing is very relevant to the issue of relator's share, and testimony should be heard on those matters.

16

Respectfully submitted this 23rd day of October, 2017.


BUTLER WOOTEN & PEAK LLP          WILBANKS & GOUINLOCK, LLP


BY: s/ Joseph M. Colwell          BY: s/ Marlan B. Wilbanks
JAMES E. BUTLER, JR.              MARLAN B. WILBANKS
  jim@butlerwooten.com              mbw@wilbanksgouinlock.com
  Georgia Bar No. 099625            Georgia Bar No. 758223
BRANDON L. PEAK                   TY M. BRIDGES
  brandon@butlerwooten.com          tmb@wilbanksgouinlock.com
  Georgia Bar No. 141605            Georgia Bar No. 081500
JOSEPH M. COLWELL                 3414 Peachtree Street, N.E., Ste. 1075
  joseph@butlerwooten.com         Atlanta, Georgia 30326
  Georgia Bar No. 531527          (404) 842-1075
ROBERT H. SNYDER                  (404) 842-0559 Fax
  rob@butlerwooten.com
  Georgia Bar No. 404522
2719 Buford Highway               PHILLIPS & COHEN
Atlanta, Georgia  30324
(404) 321-1700
(404) 321-1713 Fax                BY: s/ Mary Louise Cohen
                                  MARY LOUISE COHEN
                                    mlc@phillipsandcohen.com
                                    DC Bar No. 298299
                                  2000 Massachusetts Avenue, N.W.
                                  Washington, DC 20036
                                  (202) 833-4567
                                  (202) 833-1815 Fax

                                  Attorneys for Relators/Plaintiffs

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rules 5.1(B) and 7.1(D), I hereby certify that the

foregoing filing complies with the applicable font and size requirements and is

formatted in Times New Roman, 14 point font.

s/  Joseph M. Colwell
JAMES E. BUTLER, JR.
  Georgia Bar No. 099625
BRANDON L. PEAK
  Georgia Bar No. 141605
JOSEPH M. COLWELL
  Georgia Bar No. 531527
ROBERT H. SNYDER, JR.
  Georgia Bar No. 404522
Butler Wooten & Peak LLP
2719 Buford Highway
Atlanta, Georgia  30324
(404) 321-1700
(404) 321-1713 Fax

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on October 23, 2017, I electronically filed RELATORS' REPLY IN SUPPORT OF THEIR MOTION FOR AN AWARD OF THE MAXIMUM RELATORS' SHARE with the Clerk of the Court using the CM/ECF system which will automatically send email notification of such filing to the following attorneys of record:

Amy P. Williams
Troutman Sanders LLP
301 South College Street, Suite 3400
Charlotte, NC  28202

Lawrence C. Lanpher
Soyong Cho
Robert W. Manoso
K & L Gates, LLP
1601 K Street, N.W.
Washington, DC  20006

Charles T. Huddleston
Nelson Mullins Riley &
   Scarborough LLP
201 17th Street, N.W., Suite 1700
Atlanta, GA  30363

I certify I have served this document on the following via e-mail:

*United States of America:*
Alan S. Gale
United States Department of Justice
P.O. Box 261
Ben Franklin Station
Washington, DC  20044
  *Alan.Gale@usdoj.gov*

*-and-*
Paris Wynn
Assistant U.S. Attorney
600 U.S. Courthouse
75 Spring Street, S.W.
Atlanta, GA  30303
  *Paris.Wynn@usdoj.gov*

This 23rd day of October, 2017.

BY: s/  Joseph M. Colwell
JAMES E. BUTLER, JR.
  Georgia Bar No. 099625
BRANDON L. PEAK
  Georgia Bar No. 141605
JOSEPH M. COLWELL
  Georgia Bar No. 531527
ROBERT H. SNYDER, JR.
  Georgia Bar No. 404522
Butler Wooten & Peak LLP
2719 Buford Highway
Atlanta, Georgia 30324
(404) 321-1700
(404) 321-1713 Fax