# EXHIBIT 1

# FACT SHEET

# SIGNIFICANT FALSE CLAIMS ACT SETTLEMENTS & JUDGMENTS

# FISCAL YEARS 2009-2016

**Health Care Fraud**

**The Department recovered $19.3 billion for the federal government in False Claims Act settlements and judgments relating to health care fraud in fiscal years 2009 to 2016, and billions more during the same period for state Medicaid programs and in criminal fines and forfeitures. Significant False Claims Act cases include:**

- GlaxoSmithKline LLC paid $3 billion in a 2012 global settlement that included $1.5 billion in federal civil recoveries under the False Claims Act, $478 million in state Medicaid recoveries, and **$**1 billion in criminal fines and forfeitures. The settlement resolved allegations that the company (1) promoted the drugs Paxil, Wellbutrin, Advair, Lamictal, and Zofran for uses not approved by the U.S. Food and Drug Administration (FDA), known as off-label use, and paid kickbacks to physicians to prescribe those drugs as well as the drugs Imitrex, Lotronex, Flovent and Valtrex; (2) made false and misleading statements concerning the safety of the drug Avandia; and (3) reported false best prices and underpaid rebates owed under the Medicaid Drug Rebate Program. The $3 billion settlement is the largest health care fraud settlement in U.S. history. In addition, GSK signed a five-year corporate integrity agreement with the Department of Health and Human Services, Office of Inspector General (HHS OIG), to ensure compliance in the future. The settlement resolved multiple *qui tam* actions in which the relators received $131 million as their share of the settlement.

- Pfizer Inc. paid $2.3 billion in a 2009 global settlement, including $692 million (including interest) in federal civil recoveries under the False Claims Act, $331 million in recoveries for state Medicaid programs, and $1.3 billion in criminal fines and forfeitures. The settlement resolved allegations that the company illegally promoted the drugs Bextra, Geodon, Zyvox, and Lyrica for uses not approved by the FDA and paid kickbacks in connection with its marketing of these and nine other drugs: Aricept, Celebrex, Lipitor, Norvasc, Relpax, Viagra, Zithromax, Zoloft and Zyrtec. The United States alleged that Pfizer's illegal marketing of these drugs caused providers to charge federal health insurance programs such as Medicare, Medicaid, TRICARE, and the Federal Employees Health Benefits Program, for uses not covered by those programs. The settlement resolved nine *qui tam* lawsuits in which the relators received $106 million. Pfizer also entered into a five-year corporate integrity agreement with the HHS OIG to ensure compliance in the future.

- Global health care giant Johnson & Johnson and its subsidiaries, Janssen Pharmaceuticals and Scios (J&J), paid $2.2 billion in a 2013 global settlement that included $1.1 billion in federal recoveries under the False Claims Act, more than $600 million for state Medicaid programs, and $485 million in criminal fines and forfeitures. The

settlement resolved claims relating to the prescription drugs Risperdal, Invega and Natrecor.  The government alleged that J&J promoted the drugs for uses not approved as safe and effective by the FDA.  Because J&J marketed the drugs for uses not covered by federal health care programs, the company's promotion of the drugs caused physicians and other health care providers to submit hundreds of millions of dollars in alleged false claims against Medicare, Medicaid, TRICARE and other federal health care programs.  The government also alleged that J&J paid kickbacks to physicians and to Omnicare Inc., the nation's largest provider of pharmaceuticals to nursing homes and long-term care facilities.  The settlement resolved two *qui tam* lawsuits in which the relators received $140 million.

- Abbott Laboratories Inc. paid $1.5 billion in a 2012 global settlement, including $575 million in federal recoveries under the False Claims Act, $225 million in state civil recoveries, and nearly $700 million in criminal fines and forfeitures.  The settlement resolved allegations that Abbott illegally promoted the drug Depakote to treat agitation and aggression in elderly dementia patients, and schizophrenia, when neither of those uses was approved as safe and effective by the FDA.  Abbott also signed a five-year corporate integrity agreement with the HHS OIG.  The settlement resolved a *qui tam* action in which the relator received $86.3 million.

- Merck Sharp & Dohme paid $963 million (including interest) in a 2012 global settlement, including $441 million in federal civil recoveries under the False Claims Act, $200 million for state Medicaid programs, and nearly $322 million in criminal fines.  The settlement resolved allegations that the company promoted the drug Vioxx for off-label use for relief of rheumatoid arthritis and that company representatives made inaccurate, unsupported, or misleading statements about Vioxx's cardiovascular safety to increase sales, resulting in payments by federal health care programs.  Merck also entered into an expansive corporate integrity agreement with the HHS OIG to ensure compliance in the future.

- Eight pharmaceutical manufacturers paid $900 million in a series of fiscal year 2011 settlements to resolve allegations that they knowingly reported inflated drug prices that caused providers to submit inflated claims to the Medicaid and Medicare programs.  Many state Medicaid programs establish their payment rates for drugs based on the average wholesale prices (AWPs) reported by drug manufacturers to three leading pricing compendia.  Medicare previously also set payment rates using AWPs.  By inflating the prices reported to the compendia, Abbott Laboratories, B. Braun Medical Inc., Roxane Laboratories Inc. (now known as Boehringer Ingelheim Roxane Inc.), Dey Laboratories, Par Pharmaceutical Inc., Watson Pharmaceuticals Inc., Sandoz Inc., and Mylan Inc. allegedly caused the Medicaid and Medicare programs to establish payment rates far above the actual prices health care providers paid for them.  The manufacturers then "marketed the spread" between the actual prices they charged their customers and the amount the government later reimbursed the customer to induce higher sales.  These eight manufacturers, together with other manufacturers, were sued by relator Ven-A-Care in federal court in Boston and Miami.  Those cases, with others, became part of a large multi-district litigation presided over by U.S. District Judge Patti B. Saris.  The United

States intervened in claims against Abbott, Dey and Roxane, but allowed the relator to proceed with claims against the other five manufacturers.

- DaVita Healthcare Partners Inc., the leading provider of dialysis services in the United States, paid $805 million in a pair of fiscal year 2015 False Claims Act settlements.  The company paid $450 million to resolve allegations that it knowingly generated unnecessary waste in administering the drugs Zemplar and Venofer to dialysis patients, and then billed the government for costs that could have been avoided.  DaVita paid an additional $355 million (including interest) to resolve claims that it violated the False Claims Act by paying kickbacks to physicians to induce patient referrals to its clinics.  The settlements resolved two *qui tam* lawsuits in which the relators received $126 million and $66 million, respectively.  DaVita is headquartered in Denver, Colorado, and has dialysis clinics throughout the United States.

- Wyeth and Pfizer Inc. paid $784.6 million in a 2016 settlement to resolve federal and state claims that Wyeth (before it was acquired by Pfizer) underpaid drug rebates to Medicaid on two drugs used to treat acid reflux, Protonix Oral and Protonix IV.  The companies paid $413.2 million to the federal government and $371.4 million to state Medicaid programs.  The settlement resolved a *qui tam* lawsuit in which the relator received $98 million from the federal and state recoveries.

- Amgen Inc. paid $762 million in a 2012 global settlement, including $613 million in federal civil recoveries under the False Claims Act, $24.8 million in recoveries for state Medicaid programs, and $150 million in criminal penalties and forfeitures.  The settlement resolved allegations that Amgen (1) illegally promoted Aranesp, a drug used to treat anemia, and two other drugs it manufactured, Enbrel and Neulasta, in doses not approved by the FDA and for off-label uses not reimbursable by federal insurance programs; (2) offered kickbacks to a wide range of entities in an effort to influence health care providers to select its products, regardless of whether they were medically necessary; and (3) engaged in false price reporting practices involving several of its drugs.  In addition, Amgen signed a five-year corporate integrity agreement with the HHS OIG.  The settlement resolved 11 *qui tam* actions in which the relators received $108.7 million.

- GlaxoSmithKline, PLC (GSK) paid $750 million in a 2010 global settlement, including $436.4 million federal recoveries under the False Claims Act, $163.6 million in recoveries for state Medicaid programs, and $150 million in criminal fines and forfeitures.  The settlement resolved federal and state claims related to the sale of adulterated drugs made at GSK's now-closed Cidra, Puerto Rico manufacturing facility, to government healthcare programs.  The drugs, manufactured at the plant between 2001 and 2005, were Kytril, Bactroban, Paxil CR and Avandamet.  The United States contended that GSK sold certain batches, lots, or portions of lots of these drugs, in which the strength, purity, or quality was materially inferior to that specified in the drugs' FDA applications or related documents, and that this resulted in false claims to Medicaid and other federal health care programs.  The settlement resolved a *qui tam* suit

filed by a former GSK employee who received $97.3 million as her share of the settlement.

- Olympus Corp. of the Americas, the nation's largest distributor of endoscopes, and a subsidiary paid $646 million in a 2016 global settlement, including $267.3 million in federal recoveries under the False Claims Act, $43.5 million in recoveries for state Medicaid programs, and $335.2 million in criminal penalties.  The settlement resolved allegations that Olympus paid kickbacks to doctors and hospitals in exchange for their purchase of Olympus endoscopes and other medical and surgical devices.  The settlement resolved a *qui tam* lawsuit in which the relator received $44.1 million as his share of the federal claims.  Olympus also entered into a corporate integrity agreement with the HHS OIG to ensure future compliance with program requirements.

-  Allergan Inc. paid $600 million in a 2010 global settlement, including $210 million in recoveries under the False Claims Act, $14.7 million in recoveries for state Medicaid programs, and $375 million in criminal fines and forfeitures.  Allergan also pleaded guilty to one misdemeanor count of distributing a misbranded drug in interstate commerce.  The civil settlement resolved allegations that the company caused the submission of false claims to federal health insurance programs (1) by promoting its biologic product, Botox Therapeutic, for off-label indications that were not medically accepted and therefore not covered by federal healthcare programs; (2) by making unsubstantiated and misleading statements about the safety and efficacy of Botox for off- label indications; (3) by instructing doctors to miscode Botox claims as though they were for conditions clearly covered to ensure payment by government healthcare programs; and (4) by providing financial inducements to doctors to inject more Botox.  The settlement resolved three *qui tam* suits for which the relators received $37.8 million.

- New York State and New York City agreed to pay $540 million in a 2009 settlement to resolve claims that they violated Medicaid program requirements regarding the provision of school based health services (including speech therapy and transportation) to poor children.  The settlement, a record federal Medicaid recovery, resolved two *qui tam* lawsuits filed by a speech therapist from upstate New York. The relator received $10 million as her part of the settlement.  In addition, New York State entered into a three-year program compliance agreement with the Centers for Medicare & Medicaid Services within HHS to ensure the integrity of the program going forward.

- AstraZeneca LP and AstraZeneca Pharmaceuticals LP paid $520 million in a 2010 settlement, including $302 million in federal recoveries under the False Claims Act and $218 million in recoveries for state Medicaid programs.  The settlement resolved allegations that the company marketed its atypical anti-psychotic drug, Seroquel, for uses that the FDA did not approve and for which the United States and state Medicaid programs did not provide coverage.  The United States alleged that by promoting Seroquel for off label uses, AstraZeneca caused providers to charge federal health insurance programs such as Medicare, Medicaid, TRICARE, and the Federal Employees Health Benefits Program for unapproved uses not covered by those programs.  The

settlement resolved two *qui tam* lawsuits in which the relators received $45 million. AstraZeneca also entered into a five-year corporate integrity agreement with the HHS OIG to ensure compliance in the future.

- Tenet Healthcare Corp. paid $513 million in a 2016 global settlement, including $244.2 million in federal recoveries under the False Claims Act, $123.8 million in recoveries to state Medicaid programs, and $145 million forfeited by two Tenet subsidiaries under the terms of a guilty plea.  The settlement resolved allegations that four of Tenet's hospitals engaged in a scheme to defraud the United States by paying kickbacks in return for patient referrals.  The settlement resolved allegations in a *qui tam* lawsuit in which the relator received $56.2 million as his share of the federal claims.

- Ranbaxy Laboratories Limited, an Indian generic pharmaceutical manufacturer, and its subsidiary, Ranbaxy USA Inc., paid $508 million in a 2013 global settlement, including $237 million (including interest) in recoveries under the False Claims Act, $120.9 million in recoveries for state Medicaid programs, and $150 million in criminal fines and forfeitures.  The settlement resolved allegations that Ranbaxy caused false claims to be submitted to federal health care programs for adulterated drugs distributed from its facilities in India.  The United States alleged that Ranbaxy manufactured, distributed, and sold drugs whose strength, purity, or quality differed from the drug's specifications or that were not manufactured according to the FDA-approved formulation.  The settlement resolved a *qui tam* action in which the relator received $49.8 million.

- Novartis Pharmaceuticals Corp. paid $495 million in a pair of 2010 global settlements. The first settlement, for $422.5 million, involved allegations that Novartis marketed off-label the anti-epileptic drug Trileptal and included $149.2 million recovered for federal programs, $88.3 million recovered for state Medicaid programs, and $185 million in criminal fines and forfeitures.  This settlement also resolved allegations that Novartis paid kickbacks to health care professionals to induce them to prescribe Trileptal and five other drugs, Diovan, Zelnorm, Sandostatin, Exforge, and Tekturna.  The settlement resolved four *qui tam* lawsuits in which the relators received $25.7 million.  Novartis also entered into a five-year corporate integrity agreement with the HHS OIG to ensure compliance in the future.  The second settlement, for $72.5 million, involved the cystic fibrosis drug TOBI, which Novartis and its predecessor, Chiron Corporation, allegedly marketed for off-label use.  The settlement, which included $43.5 million recovered for federal programs and $29 million recovered for state Medicaid programs, resolved a *qui tam* lawsuit in which the relators received $7.8 million.

- In another global settlement in 2013, Wyeth Pharmaceuticals Inc. (acquired by Pfizer, Inc. in 2009) paid $494.2 million (including interest) to resolve allegations that it illegally promoted Rapamune, a drug approved for use in preventing organ rejection in patients who received renal (kidney) transplants, for non-renal transplants.  The settlement included $232.6 million in False Claims Act recoveries, $27.6 million in state civil recoveries, and $234 million in criminal fines and forfeitures.  The settlement resolved a *qui tam* action in which the relators received $39 million.

- Novartis Pharmaceuticals Corp. paid another $410 million in a fiscal year 2016 global settlement involving alleged kickbacks the company paid to specialty pharmacies to promote its drugs Exjade, an iron chelation drug, and Myfortic, an anti-rejection drug for kidney transplant recipients.  The settlement included $306.9 million (including interest) for the federal government, $83.1 million for state Medicaid programs, and $20 million in civil forfeitures.  Novartis also agreed to expand an existing corporate integrity agreement with the HHS OIG to subject its specialty pharmacy relationships to independent review and extend the term of the agreement by five years.  The settlement resolved allegations in a *qui tam* lawsuit for which the relator received $66 million as his share of the federal claims.  Together with two earlier settlements in the case (with specialty pharmacies, Bioscrip Inc. and Accredo Health Group), the *qui tam* action returned $363.6 million to the federal government and $107.4 million to state Medicaid programs, for a total of $471 million.

- Forest Laboratories Inc. and Forest Pharmaceuticals Inc. (Forest) paid $316.5 million (including interest) in a 2010 global settlement, including $92.5 million recovered under the False Claims Act, $60 million recovered for state Medicaid programs, and $164 million in criminal fines and forfeitures.  Forest Pharmaceuticals also pleaded guilty to one felony count of obstructing justice, one misdemeanor count of distributing an unapproved drug in interstate commerce, and one misdemeanor count of distributing a misbranded drug in interstate commerce.  The settlement resolved allegations that Forest caused the submission of false claims to federal health insurance programs by (1) illegally promoting the drugs Celexa and Lexapro for unapproved pediatric uses, (2) paying kickbacks to physicians through a variety of programs designed to induce providers to prescribe Celexa and Lexapro in violation of the Anti-Kickback Statute, and (3) distributing an unapproved new drug, Levothroid, in violation of the Food Drug and Cosmetic Act.  The civil settlement resolved three *qui tam* lawsuits in which the relators received $14.5 million as their share of the settlement.

- Quest Diagnostics Inc. and its subsidiary, Nichols Institute Diagnostics (NID), paid $302 million in a 2009 global settlement to resolve allegations that NID manufactured, marketed, and sold diagnostic test kits – the Advantage Intact PTH assay and four other assays – to laboratories knowing the kits produced inaccurate and unreliable results.  The settlement included $262 million in recoveries under the False Claims Act and resolved a *qui tam* lawsuit in which the relator received $45 million as his share of the settlement.  In addition, NID pleaded guilty to a felony misbranding charge in violation of the Food, Drug and Cosmetic Act and paid a criminal fine of $40 million.  The company also entered into a corporate integrity agreement with the HHS OIG to ensure compliance in the future.

- Millennium Health (formerly Millennium Laboratories) paid $260 million (including interest) in a fiscal year 2016 global settlement to resolve allegations that it billed Medicare, Medicaid, and other federal health care programs for excessive and unnecessary urine drug and genetic testing and gave free items to induce physicians to refer expensive and profitable lab tests to Millennium, in violation of the Anti-Kickback Statute and Stark Law.  The settlement included $214.8 million in alleged false claims

against federal programs, $26 million in alleged false claims against state Medicaid programs, and $19.2 million in related administrative claims.  The settlement resolved allegations in eight *qui tam* lawsuits in which the relators received $31.8 million.  Millennium also entered into a corporate integrity agreement with the HHS OIG to ensure future compliance with program requirements.


**Housing & Financial Fraud**

**The Department recovered more than $7 billion for the federal government in False Claims Act settlements and judgments relating to housing and financial fraud in fiscal years 2009 to 2016, and billions more during the same period in penalties under the Financial Institutions Reform, Recovery and Enforcement Act (FIRREA) and for consumer relief.  Significant False Claims Act cases include:**

- The nation's five largest mortgage servicers – Bank of America Corporation, JP Morgan Chase & Co., Wells Fargo & Company, Citigroup Inc. and Ally Financial Inc. (formerly GMAC) – reached a $25 billion landmark settlement with the federal government and the attorneys general of 49 states and the District of Columbia, to address mortgage loan servicing and foreclosure abuses.  The 2012 settlement included $911.7 million in civil False Claims Act recoveries on behalf of federal mortgage insurance programs, and resolved five *qui tam* actions in which the relators received $47 million as their share of the proceeds.  The global settlement also included provisions providing substantial financial relief to homeowners and establishing significant new homeowner protections for the future.

- Bank of America paid $16.65 billion in a 2014 settlement that included $1.85 billion to settle allegations of false claims in connection with the bank's practices in originating, underwriting, and quality control of residential mortgages the bank sold to Fannie Mae and Freddie Mac, as well as loans insured by the Federal Housing Administration (FHA).  The settlement also covered the bank's alleged submission of inflated insurance claims to the FHA.  Bank of America admitted that it had misrepresented the quality of loans to Fannie Mae, Freddie Mac, and the FHA.  In addition to the $1.85 billion paid to settle False Claims Act allegations, the bank paid a $5 billion penalty under the Financial Institutions Reform, Recovery and Enforcement Act (FIRREA) and $7 billion in relief to consumers harmed by the financial crisis to redress abuses in residential mortgage backed security practices.  The $16.65 billion is the largest amount paid in a civil settlement with a single entity in the Department's history.

- Wells Fargo Bank N.A. paid the United States $1.2 billion in a fiscal year 2016 agreement, in the largest settlement of loan origination violations in the history of the FHA.  The bank admitted that it originated and endorsed residential home mortgages as eligible for federal insurance that did not meet FHA requirements intended to reduce the risk of default.  As part of the settlement, Wells Fargo's Vice President of Credit Risk – Quality Assurance Kurt Lofrano, admitted that he annually certified the bank's

compliance with FHA's Direct Endorsement Lender program and continued qualification to remain in the program.

- SunTrust Mortgage Inc. paid $968 million in a 2014 agreement to redress its abusive mortgage origination and servicing practices, including $428.2 million (including interest) to settle allegations of false claims in connection with mortgages insured by the FHA.  SunTrust admitted that from 2006 to 2012, it originated and underwrote FHA-insured mortgages that did not qualify for federal insurance under the FHA program, failed to institute an effective quality control program to identify noncompliant loans and failed to report the noncompliant loans it did identify to the FHA as required.  In addition to the $428.2 million restored to the federal treasury, SunTrust agreed to provide $500 million in relief to struggling homeowners by various means, including reducing the principal on mortgages for borrowers at risk of default and reducing interest rates for homeowners with underwater mortgages.  SunTrust also agreed to pay $10 million to the federal government and an additional $40 million to state governments to remedy the effects of its improper loan servicing practices.

- JPMorgan Chase paid $614 million in a 2014 agreement for violating the False Claims Act by knowingly originating and underwriting ineligible mortgage loans submitted for insurance coverage and guarantees by the FHA and the Department of Veterans Affairs (VA).  The company admitted that it approved thousands of FHA loans and hundreds of VA loans that were not eligible for FHA or VA insurance because they did not meet agency underwriting requirements.  JPMorgan Chase further admitted that it failed to inform the FHA and the VA when its own internal reviews discovered more than 500 defective loans that never should have been submitted for FHA and VA insurance.  The settlement resolved a *qui tam* lawsuit in which the relator received $63.8 million as his share of the settlement.

- In a pair of fiscal year 2015 settlements, the Department recovered $336 million in false claims from First Tennessee Bank N.A. and MetLife Bank N.A. arising from conduct of a First Tennessee subsidiary later sold to MetLife.  First Tennessee paid $212.5 million and admitted that from 2006 to 2008, through its subsidiary, First Horizon Home Loans Corporation, it originated and endorsed mortgages for federal insurance by the FHA that did not meet eligibility requirements.  First Tennessee also admitted failing to report such deficiencies to the authorities as required under the program despite widespread knowledge by its senior managers by early 2008.  In August 2008, First Tennessee sold First Horizon to MetLife Bank N.A., a wholly-owned subsidiary of MetLife Inc.  MetLife admitted similar misconduct regarding the loans it originated and endorsed from September 2008 to March 2012.  MetLife paid the United States $123.5 million to resolve liability under the False Claims Act arising from its misconduct in endorsing mortgagees for FHA insurance.

- Deutsche Bank AG and MortgageIT paid $202.3 million in a 2012 agreement to settle allegations that they repeatedly submitted false certifications in connection with their residential mortgage origination practices, causing substantial losses to the FHA's insurance fund.

- U.S. Bank paid $200 million in a 2014 agreement to settle allegations that it violated the False Claims Act by knowingly originating and underwriting mortgage loans insured by the FHA that did not meet agency requirements.  As part of the settlement, U.S. Bank admitted that from 2006 to 2011, it repeatedly certified for FHA insurance mortgage loans that did not meet agency underwriting requirements.  The bank also admitted that its quality control program did not meet FHA requirements and, as a result, it failed to identify deficiencies, failed to self-report deficiencies as required, and failed to take corrective action as required under the program.  Finally, U.S. Bank admitted that its conduct caused FHA to insure thousands of loans that were not eligible for insurance and caused FHA to suffer substantial losses when it later paid insurance claims on those loans.

- CitiMortgage Inc., a subsidiary of CitiBank, paid $158.3 million in a 2012 agreement to settle allegations that it repeatedly submitted false certifications in connection with its residential mortgage origination practices, causing substantial losses dating back to 2004, to the FHAs insurance fund.  As part of the settlement, CitiMortgage admitted liability and accepted responsibility for its conduct.  The settlement resolved a *qui tam* action in which the relator received $31.66 million as her share of the settlement.

**Procurement Fraud**

**The Department recovered $3.6 billion in False Claims Act settlements and judgments relating to procurement fraud in fiscal years 2009 to 2016, and millions more during the same period in criminal fines and forfeitures.  Significant False Claims Act cases include:**

- Supreme Group B.V. and its subsidiaries and affiliates paid $434 million in a fiscal year 2015 global settlement involving wartime contracts.  Supreme Group and its subsidiaries paid $146 million to resolve allegations that the companies submitted false claims to the Department of Defense for food, water, fuel, and transportation of cargo for American soldiers in Afghanistan.  Supreme Group is based in Dubai, United Arab Emirates (UAE).  In addition, Supreme Group's affiliates Supreme Foodservice GmbH, a privately held Swiss company, and Supreme Foodservice FZE, a privately-held UAE company, pleaded guilty to related criminal violations and paid more than $288 million in criminal fines and forfeitures.

- In 2009, Northrop Grumman Corp. entered a $325 million settlement in a False Claims Act *qui tam* lawsuit involving defective satellite parts – the largest civil fraud settlement in the intelligence community.  The government alleged that Northrop provided and billed the National Reconnaissance Office (NRO) for defective microelectronic parts, known as Heterojunction Bipolar Transistors (HBTs), which were integrated into NRO satellite equipment.  The relator received $48.75 million as his share of the settlement.  The parties simultaneously resolved a lawsuit filed by Northrop against the United States concerning the government's decision to terminate the company's contract with the Air Force to develop and produce the Tri-Service Standoff Attack Missile, for $325 million.

    The settlement ended 12 years of litigation in which Northrop claimed in excess of a $1 billion.

- Oracle Corp. and Oracle USA paid $200 million (including interest) in a 2011 settlement to resolve allegations of false claims in connection with the software companies' contract with the General Services Administration (GSA) – a record for GSA procurement fraud. GSA negotiates contracts with private sector companies for the purchase of commonly used commercial goods and services by agencies throughout the government.  As part of their contract to gain access to the vast federal marketplace, these companies agree to disclose the discounts given to their commercial customers and to pass along those discounts to the government.  The $200 million settlement resolved allegations that the company overcharged the government by failing to disclose substantially lower prices offered to its commercial customers.  The allegations were initiated by a *qui tam* action in which the relator was awarded $40 million as his share of the settlement.

- NetApp Inc. and NetApp U.S. Public Sector Inc. paid $128.7 million to settle claims that they knowingly overcharged government agencies for information technology products and services sold under two GSA contracts.  The 2009 settlement resolved *qui tam* allegations brought by a former employee who claimed that the companies made false statements to GSA about the discounts provided to commercial customers and sold goods and services to government purchasers at prices that were not discounted as highly as they should have been. The relator received $19.3 million as his share of the settlement.

Verizon Communications Inc. paid $96.5 million (including interest) in a 2011 settlement to resolve False Claims Act allegations that the company charged the government for federal, state, and local taxes and surcharges in violation of GSA's FTS2001 and FTS2001 Bridge contracts for telecommunication services.   The settlement resolved allegations that Verizon knowingly inflated billings under the contracts by including property taxes, carrier cost recovery charges, and other surcharges that were not directly reimbursable under the contracts.  The settlement resolved a *qui tam* lawsuit in which the relators received $18.9 million as their share of the settlement.

**Other Fraud Recoveries**
**The Department recovered more than $1.1 billion in False Claims Act settlements and judgments in matters involving programs unrelated to health care, housing and financial, and procurement fraud in fiscal years 2009 to 2016, and recovered billions more during the same period in environmental relief and state compensation.  Significant False Claims Act cases include:**

- Thirteen oil and gas companies paid $146.7 million in settlements from 2009 to 2012 to resolve False Claims Act allegations that over a 20-year period the companies knowingly underpaid royalties for gas extracted from federal and Indian lands.  The Department entered into separate settlements to resolve claims against Chevron Corporation, Texaco, and Unocal Corporation ($45.6 million); Mobil Natural Gas Inc. and Mobil Exploration & Producing U.S. Inc. ($32.3  million); Marathon Oil Company ($4.6 million); Dominion Exploration and Production Inc. ($2.2 million); Occidental Petroleum Corporation ($2.1 million); Shell Offshore Inc. and Shell Frontier Oil & Gas Inc. ($2.3 million); Anadarko

Petroleum Corp. ($17.3 million); BP Amoco Corporation ($20.6 million); Total Fina S.A. and Total Minatome Corporation ($15 million); Devon Energy Corporation ($3.5 million); and Exxon Mobil ($789,000).  The relator received $24.5 million as his share of the recoveries.

- Education Management Corp., the second largest for-profit education company in the country, paid $95.5 million, including $52.6 million in False Claims Act recoveries, in a fiscal year 2016 settlement to resolve allegations that the company unlawfully recruited students, engaged in deceptive and misleading recruiting practices, and falsely certified compliance with Title IV of the Higher Education Act and parallel state laws that prohibited such conduct.  The settlement reflected the company's financial condition and ability to pay, and includes proceeds paid to the United States and several states.  The settlement resolved allegations in four *qui tam* lawsuits in which the relators received $11.3 million.

- BP Exploration and Production Inc. (BP) paid $82.6 million in false claims pursuant to a $20 billion consent decree entered in 2016, arising from the Deepwater Horizon/ Macondo Well explosion and oil spill in the Gulf of Mexico in April 2010.  The government alleged that BP provided false reports about its "safe drilling margin" that concealed its improper drilling and left the well in a fragile state that ultimately resulted in the blowout.  In addition to the $82.6 million in recoveries under the False Claims Act, the consent decree, reached with the United States and five Gulf states, required BP to pay damages and penalties under state and federal environmental laws, mandated restoration of the area, and ordered other relief.

- BNP Paribas, a global financial institution headquartered in Paris, France, paid an $80 million judgment in 2014, for violations of the Department of Agriculture's (USDA's) Supplier Credit Guarantee Program.  Under the program, the USDA guaranteed credit extended to foreign importers to purchase grain and other agricultural commodities from domestic growers and distributers, which opened up foreign markets for U.S. commodities.  To qualify for the program, the U.S. exporter and the foreign importer had to be distinct companies, not under common ownership or control.  BNP Paribas consented to an $80 million judgment entered by the court to resolve the government's allegations that the bank knowingly engaged in a scheme to defraud the Supplier Credit Guarantee Program by accepting the assignment of credit guarantees given by U.S. exporters on the sale of grain to Mexican importers under common ownership or control.  The government alleged that BNP knew that the exporters and importers were disqualified from the program because of their common ownership and also knew that some of the transactions were total shams that did not involve a sale or shipment at all.  Yet when the Mexican importers defaulted on the credit financing, BNP claimed reimbursement from the USDA on the guarantees.  In 2012, BNP Paribas vice president Jerry Cruz, who had accepted bribes from the exporters, pleaded guilty to charges involving bank fraud, mail and wire fraud, and money laundering for his part in the scheme.